# EXHIBIT A

# LONDON COURT OF INTERNATIONAL ARBITRATION
## LCIA No: 142732

## IN THE MATTER OF THE ARBITRATION ACT 1996

## AND IN THE MATTER OF AN ARBITRATION

BETWEEN:

(1) Republic of Djibouti
(2) Djibouti Ports and Free Zone Authority
(3) Port de Djibouti SA

<u>Claimants</u>

- and -

(1) DP World Djibouti FZCO
(2) Dubai (International) Djibouti FZE
(3) Doraleh Container Terminal SA

<u>Respondents</u>

---

## THIRD PARTIAL FINAL AWARD:
## THE RESPONDENTS' COUNTERCLAIMS

---

**The Tribunal**

Lord Hoffmann
Peter Leaver QC
Sir Richard Aikens (President)

Issued pursuant to The Rules of the
London Court of International Arbitration 1998 ("the LCIA Rules")

## Contents

A.    The background ................................................................................................ 3

B.    The present arbitration proceedings so far ................................................... 5

C.    Other events before and after the hearing leading to the application for a stay of the present arbitration .................................................................................... 7

D.    The counterclaim for unpaid royalties: (1) in principle ........................... 10

E.    The counterclaim for unpaid royalties: (2) damages: quantum and interest...... 16

F.    The counterclaim for breach of the "exclusivity" provisions:  (1) the CA terms and the facts............................................................................................... 20

G.    The counterclaim for the breach of the "exclusivity" provisions: (2) was the Republic in breach of the terms of clauses 3.6.2 and/ or 3.6.3 of the CA in respect of the development of the DMP and/or the DICT?............................... 23

H.    The counterclaim for damages for breach of the "exclusivity provisions": (3) on what basis should the damages be calculated? ...................................... 24

I.    The counterclaim for breach of the "exclusivity" provisions: (4) quantum and interest.................................................................................................. 29

J.    Relief sought by the respondents. ........................................................... 31

K.    Costs ....................................................................................................... 32

**A.      The background**

1.      The background to the present arbitration proceedings is explained in the first Partial
        Final Award of this tribunal dated 20 February 2017.  We need not repeat the detail.
        In summary, in the late 20th century the port of Djibouti ("the Old Port") in the
        Republic of Djibouti was very out of date and inefficient. The Republic of Djibouti
        ("Djibouti") wished to develop new port facilities at Doraleh, including a container
        terminal and other facilities. The existing port authority having jurisdiction over all
        the ports in Djibouti was the Port Autonome Internationale de Djibouti ("PAID"). Its
        name was subsequently changed to Port de Djibouti SA ("PDSA"). A new entity, the
        Djibouti Ports and Free Zone Authority ("DPFZA") was established by Presidential
        Decree on 2 June 2002.   The government of Djibouti, through DPFZA, entered into
        negotiations with Dubai Ports Authority ("DPA"), which subsequently became DP
        World Limited ("DP World"), on reaching an agreement to construct and manage a
        proposed new terminal. The agreement concluded was that a new joint venture
        company, called Doraleh Container Terminal SA ("DCT") would be created,  which
        would be jointly owed by PAID/PDSA (as to 66.66% of the shares) and DP World (as
        to 33.34% of the shares).  Importantly, despite owning only a minority of the shares,
        DP World would have the right to appoint the majority of the board of directors and
        DP World would have effective control of DCT.  On 21 June 2006 the Parliament of
        Djibouti enacted a law establishing DCT. As agreed, 66.66% of the share capital was
        taken by PAID/PDSA and 33.34% was taken by DP World Djibouti FZCO ("DP
        World Djibouti").

2.      The first claimant in this arbitration, the Republic of Djibouti, entered into a
        Concession Agreement ("the CA") dated 30 October 2006, with DCT and Dubai
        (International) Djibouti FZE ("DID"), which was a subsidiary of DP World. (For the
        purposes of the CA, the parties to the CA included the DPFZA and PDSA, both of
        which were under the control of Djibouti). Under a power of attorney granted to him
        by presidential decree, Mr Abdourahman Boreh, then a prominent Djibouti
        businessman and close associate of the President, signed the CA on behalf of Djibouti
        on 31 October 2006.  The CA gave DCT the exclusive right, for a thirty year period
        (plus two further 10 year extension periods) to develop, construct, manage and operate

3

a new terminal at Doraleh: "the Terminal". On 18 December 2006 the Djibouti Parliament enacted a law ratifying the CA and giving it the force of statutory law.

3.   Subsequently, DCT entered into a Management Services Agreement, ("MSA"), dated 6 December 2006, with DP World Djibouti, whereby the latter would carry out and complete various services as identified in the MSA, for which DP World Djibouti was to be paid a management fee. On 22 May 2007 an Addendum to the CA was signed. The Djibouti Parliament enacted a law on 19 January 2008 to confirm that the Addendum had full statutory power and effect. Also on 22 May 2007 a Joint Venture Agreement was agreed between DP World Djibouti and PDSA, confirming the agreement that DCT would be managed by DP World Djibouti and that it would control DCT by being guaranteed a majority of directors on the board of DCT.

4.   The construction of the Terminal was completed swiftly and it opened in December 2008. It has proved very profitable.

5.   For reasons that are explained in more detail in this tribunal's first Partial Final Award, in July 2014 the claimants alleged that they were entitled to rescind the CA, the Joint Venture Agreement and the MSA and they purported to do so.

6.   Article 20 of the CA provides for the arbitration of any dispute under the CA in accordance with LCIA Rules, if the dispute cannot be settled amicably. The claimants made a Request for Arbitration on 8 July 2014. The respondents' response was filed on 21 August 2014. The claimants nominated Mr Peter Leaver QC as their arbitrator and the respondents nominated Lord Hoffmann. The two arbitrators originally nominated Sir Simon Tuckey as the third arbitrator and chairman of the tribunal. He subsequently resigned and his place was taken by Sir Richard Aikens.

7.   As well as starting the present arbitration proceedings, Djibouti brought proceedings in the English Commercial Court against Mr Boreh and three companies controlled by him. The claims were dismissed by Flaux J in a judgment delivered on 2 March 2016: (see [2016] EWHC (Com) 405). An application to appeal was dismissed by Longmore LJ after an oral hearing on 17 June 2016.

**B.      The present arbitration proceedings so far**

8.      A hearing took place between 20 September and 6 October 2016. The claimants' claims for rescission of the CA and for damages were dealt with during that hearing and were the subject of the tribunal's first Partial Final Award dated 20 February 2017. The tribunal dismissed the claimants' claims in their entirety.

9.      The respondents had raised various counterclaims of which three remained in issue at the close of the hearing on 6 October 2016. They were, in summary: (1) payment of royalties for historic container traffic on mixed cargo vessels handled at the Old Port; (2) payment of royalties for handling future container traffic which was from Ethiopian Shipping Lines and Messina Shipping Lines mixed cargo vessels but at the Terminal; and (3) breach of the exclusivity clauses in the CA, save as covered by counterclaims (1) and (2).

10.      In a joint letter dated 13 October 2016 from the lawyers acting then for the parties[1] it was recorded that (as had been foreshadowed at the hearing) the parties had agreed that the reference before the tribunal in respect of the respondents' counterclaims should be stayed for a period of three months. The parties were to negotiate on the basis set out in the letter.   The letter also recorded that if agreement had not been reached by the end of the three month period or the parties did not agree to continue the stay, then the arbitration in respect of the counterclaims should resume.

11.      The tribunal issued a Second Partial Final Award dated 29 June 2017 dealing with the costs of the arbitration up to and including the first Partial Final Award. The tribunal awarded the respondents costs of £7 million.

12.      There were negotiations on the counterclaims for some time after October 2016. However, in a letter dated 28 December 2017 to the tribunal, QE stated that the claimants had ceased to engage in these so that the parties had been unable to reach any agreement on the counterclaims. The respondents accordingly requested the tribunal to resume the arbitration in respect of the counterclaims.

---

[1] Quinn Emanuel Urquhart & Sullivan LLP ("QE") acted then and now for the respondents.  At the time of the hearing in September-October 2016 and until 18 December 2017 Gibson Dunn & Crutcher LLP ("Gibson Dunn") acted for the claimants. At present Cabinet Ghaleb acts for the Republic of Djibouti but the tribunal is not aware of other lawyers acting for other claimants.

13.    In the same letter QE summarised the respondents' pending counterclaims as concerning: "the claimants' breaches of: (i) Articles 3.6.2 and 3.6.3 of the CA, which confer on DCT exclusivity over handling of container traffic in Djibouti; and (ii) Articles 7.1.1 and 7.12(i) of the CA in relation to certain unpaid royalties for container traffic handed at the Old Port". The tribunal attempted to obtain from the claimants their reaction to QE's letter but there was no response. Accordingly, in a letter of 19 February 2018 the tribunal set out a timetable for dealing with the remaining issues in the arbitration, leading to an oral hearing if necessary in the second half of 2018.

14.    Pursuant to the procedural timetable on 16 March 2018 the respondents filed and served their Additional Requests for the Production of Documents in relation to the counterclaims. The claimants did not make any similar additional requests for documents from the claimants. The respondents' requests were unanswered by the claimants.

15.    On 2 July 2018 the respondents served Written Submissions in support of their counterclaims, having requested and been granted an extension of time from 11 June 2018, which was the date originally stipulated in the tribunal's procedural timetable. The claimants had liberty to file submissions in response by 23 July 2018 (on the revised timetable) but did not do so.

16.    The respondents requested the tribunal to fix a date for an oral hearing of the counterclaims. The tribunal suggested several dates to all the parties in an email dated 24 July 2018 and in a letter to the claimants of the same date. The respondents requested the hearing take place on 9 November 2018. There was no response from the claimants or their advisors. The tribunal accordingly fixed 9 November 2018 as the hearing date and this decision was communicated to the parties by email dated 22 August 2018 and by a letter dated 21 August 2018 attached to that email and sent by post to the claimants.

17.    The hearing took place on 9 November 2018. The respondents were represented by Mr Mark Howard QC and by QE. The claimants did not appear and were not represented. Despite this fact and in the light of the claimants' failure to respond to communications from either the tribunal or the respondents, the tribunal decided to continue with the hearing.

**C.     Other events before and after the hearing leading to the application for a stay of the present arbitration**

18.     In a letter dated 6 October 2018 from QE to the tribunal (a copy of which was emailed to Mr Aboubaker Omar Hadi and to the LCIA), QE informed the tribunal of the following matters (amongst others): [2] (1) In late 2017 the National Assembly of Djibouti passed Law 202 on Strategic Infrastructure Contracts. (2) On 19 February 2018 DP World Djibouti and DCT issued a Notice of Dispute to the government of Djibouti and started a further arbitration pursuant to Article 20 of the CA on 20 February 2018. This further arbitration is LCIA Case No 183886. The sole arbitrator appointed by the LCIA in that arbitration is Professor Zachary Douglas QC: ("the Douglas arbitration"). (3) On 22 February 2018 Djibouti seized physical control of the Terminal and expelled DP World Djibouti employees from the country.  (4) On 28 July 2018, PDSA sent a letter to DP World Djibouti stating that it had decided to terminate the JVA dated 22 May 2007. DP World Djibouti rejected PDSA's action. (5) PDSA purported to call a meeting of DCT shareholders for 9 September 2018 at which resolutions for the removal from the board of DCT of the directors appointed by DP World Djibouti and their replacement by directors nominated by DPSA would be proposed. (6) DP World Djibouti applied to the High Court of England and Wales for urgent injunctive relief under section 44(3) of the Arbitration Act 1996, to restrain DP World Djibouti from proceeding as if the JVA were terminated and from voting to remove DP World Djibouti's appointed directors at the proposed shareholders' meeting. An injunction in those terms was granted *ex parte* on 31 August 2018. It was continued after a further hearing on 14 September 2018 in which the claimants did not participate. (7) On 5 September 2018 DP World Djibouti filed at the LCIA a request for arbitration under the terms of the JVA and under the Articles of DCT. The LCIA has appointed Professor Maxi Scherer as sole arbitrator in that arbitration: ("the Scherer arbitration"). (8) On 9 September 2018 a Presidential Ordinance purported to nationalise PDSA's shareholding in DCT.  The validity of that action is not accepted by the respondents. (9) On 21 September 2018 DP World Djibouti received a Complaint issued in the Djibouti Court of First Instance naming Djibouti as claimant and DCT as respondent. The relief sought was the annulment of various Articles of

---

[2] The tribunal summarises the matters as set out in the letter of QE without being able to comment on the factual or legal validity of them, save as may be relevant to the present award.

7

DCT and of a resolution of its board passed on 18 February 2018 authorising the start of the Douglas arbitration and other litigation. (10) On 26 September 2018 Djibouti applied to the Djibouti Court of First Instance in summary proceedings seeking the appointment of a provisional administrator over DCT on the ground that there were grave tensions between the shareholders of DCT. On 27 September 2018 the Court made such an order, appointing Mme Chantal Tadoral as provisional administrator. Neither DCT nor DP World Djibouti was present at either hearing. On 4 October DCT's board lodged papers with the Djibouti court challenging Mme Tadoral's appointment.[3]

19.    After the oral hearing in this arbitration on 9 November 2018, on 14 November 2018 the tribunal received a copy of an email sent to Mme Tadoral by Maître Mouktar Ghaleb of Cabinet Ghaleb, a Djibouti law firm, acting as lawyer for Djibouti. This email (in French) invited Mme Tadoral to inform the tribunal that she was the sole legitimate representative of DCT since her appointment as provisional administrator by the Djibouti Court. The email further asked Mme Tadoral to invite the tribunal to stay the present arbitration pending the resolution of proceedings in Djibouti concerning the control of DCT. In a letter dated 19 November 2018 to the tribunal, Mme Tadoral invited the tribunal to stay the present arbitration "pending a final and binding decision in Djibouti regarding the governance and control of DCT". In a letter dated 22 November 2018 the tribunal invited QE for its comments on these two documents. QE responded in a letter dated 26 November 2018 in which it stated (amongst other things) that the respondents challenged the validity of Mme Tadoral's appointment and opposed the application for a stay. There was further correspondence on the issue of a stay: a letter from Mme Tadoral dated 1 December 2018, then a response to that letter from QE dated 4 December 2018.

20.    After the tribunal had considered these submissions, a further email was sent to the parties (including Mme Tadoral) on 17 December 2018, inviting submissions on three particular questions, as follows:  (a) is there any challenge under Djibouti law to the Provisional Administrator's claim that she has replaced the Board of DCT;  (b) if not,

---

[3] From subsequent correspondence the tribunal understands that the challenge was rejected in an *inter partes* hearing on 9 October 2018. On 21 November 2018 DP World Djibouti appealed that order. As far as the tribunal is aware that appeal has yet to be heard.

whether there is any ground upon which the tribunal could refuse to apply Djibouti law as to the validity of the appointment of the Provisional Administrator and her powers to act as such; and (c) in view of the nature of the counterclaims for debt and damages, is it relevant that there are two other counter-claimants, in addition to DCT, and if so why. The tribunal requested the parties to provide any further concise submissions they may have on these questions by 12 noon GMT on Monday 24 December 2018. Both QE (on behalf of the respondents) and Mme Tadoral provided further submissions.

21. On 3 January 2019 the tribunal issued its Decision on the application for a stay of the arbitration proceedings. It rejected the application. The Decision stated, at paragraph 8:

> "It is clear from all the submissions that we have considered carefully that there is a major dispute between the parties as to the validity of the appointment of Mme Tadoral as Provisional Administrator of DCT. That dispute is continuing. The Tribunal accepts that there are powerful points to be made on both sides. This Tribunal has not been invited to decide on the question of the validity of Mme Tadoral's appointment and it does not do so. However, in all the circumstances, particularly given the facts that (a) this arbitration had proceeded, without challenge from the Claimants or Mme Tadoral, to the stage of a hearing of the Respondents' counterclaims and (b) no further participation from either side is required and that all that remains is for the Tribunal to deliver its award, the tribunal has decided that it should NOT stay the proceedings now."

22. In these circumstances the tribunal must give its substantive award on the respondents' counterclaims.

23. At the hearing on 9 November 2018 Mr Howard presented first the respondents' case on the counterclaim for unpaid royalty payments and then the counterclaim for damages for breach of the obligation of "exclusivity". We deal with them below in the same order. At the end of the hearing the tribunal asked the respondents to set out in writing precisely what relief they were seeking in any award to be made by the tribunal in relation to the counterclaims.

24. The respondents did so in an annexure to a letter dated 13 November 2018 from QE to the tribunal. This asked that the tribunal to:

(a)  DECLARE that the Claimants have breached Articles 3.6.2 and 3.6.3 of the

9

Concession Agreement by developing, commissioning and operating the Doraleh Multipurpose Port;

(b)  DECLARE that the Claimants have breached their obligation under Articles 7.1.1 and 7.12.(i) of the Concession Agreement to pay the Respondents royalties for container traffic diverted to other ports from the Terminal;

(c)  ORDER that the Claimants pay the Third Respondent damages in the amount of US$ 385.7 million for the breach referred to in (a) above within 30 days of the Award;

(d)  ORDER that the Claimants pay the Third Respondent damages in the amount of US$ 148.8 million for the breach referred to in (b) above within 30 days of the Award;

(e)  ORDER under Section 49 of the Arbitration Act 1996 and Article 26.4 of the LCIA Rules that the Claimants pay the Third Respondent simple interest on all of the judgment debt and damages in respect of which the Award is given at the rate of 10 percent from the date of the Award, or interest from such dates, at such rates and with such rests as it considers meets the justice of the case;

(f)  DECLARE that the Claimants have breached Article 3.6.3 of the Concession Agreement by their proposal to develop the Djibouti International Container Terminal as additional container handling facilities within the Republic of Djibouti, without having first offered the Third Respondent the opportunity to exercise its right to develop such a facility;

(g)  ORDER the Claimants to pay to the Respondents the costs they have incurred in connection with the arbitration of the counterclaims, including, without limitation, the costs of the Arbitral Tribunal and the LCIA, as well as all legal and other professional fees, in the amount of GBP 492,336.96; and

(h)  ORDER such further or other relief as the Tribunal shall deem fit.


**D.   The counterclaim for unpaid royalties: (1) in principle**

25.   Articles 3.6.1 – 3.6.3, 7.1 and 7.1.2(i) and (ii) of the CA provide as follows:




**Art. 3.6.1:**

The Grantor[4] shall, itself or through PAID, cause the entire container traffic (including any domestic or combi vessels) at the existing container terminal at the Port to be shifted to the Doraleh Container Terminal, within 30 (thirty) days from the Date of Commercial Operations of Phase I of the Project.

**Art. 3.6.2:**

The Grantor agrees that after the Date of Commercial Operations of Phase 1 of the Project and during the entire Operations Period, it shall not and shall cause the Authority and PAID not to directly or indirectly operate or commission any existing or additional facilities (including the existing container terminal at the Port) within the Republic of Djibouti for handling containers, without the prior written consent of the Concessionaires.

**Art.3.6.3**

Subject to the provisions of Articles 3.6.1 and 3.6.2 above, the Grantor agrees that in the event that it or the Authority or PAID decide or propose to develop any additional container handling facilities (including at the existing container terminal at the Port, after the Date of Commercial Operations) it shall first offer the Concessionaire the right to develop such additional container handling facilities, on such terms and conditions as may be agreed between the Parties and being no less favourable than the terms of this Agreement.

**Art. 7.1:**

The Grantor shall and shall cause PAID to cease all container handling and related/ancillary activities at the existing container terminal at the Port (including in relation to combi or domestic vessels) and to shift the entire container handling operations from the existing container terminal at the Port to the Project with immediate effect on the date being 30 (thirty) days after the Date of Commercial Operations.

**Art. 7.1.2 (i)**

Without prejudice to the provisions of Article 7.1.1 above, the Grantor agrees that all the revenues earned from the handling of containers and all ancillary or related services at the existing container terminal from the Date of Commercial Operations till the date of transfer of container handling activities shall be paid to the Concessionaire at the end of the Month in which such revenues have been earned.

**Art. 7.1.2(ii)**

---

[4] In the definitions "The Grantor" is the Republic of Djibouti;  "The Concessionaire" is DCT. "The Authority" is defined in the preamble as being the Djibouti Ports and Free Zones Authority, viz. the DPFZA.  As already noted, PAID was subsequently renamed Port de Djibouti SA, or "PDSA".

The Grantor shall cause PAID to provide the Concessionaire with a duly certified monthly statement from the auditors of the Port stating the revenues earned from the existing container terminal and the sources of such revenues for the period commencing from the Date of Commercial Operations.

26.   In Article 1.1 of the CA, the phrase "Date of Commercial Operations" is defined as follows:

> **"Date of Commercial Operations"** in respect of Phase I of the Project means the earlier of: (a) the date of issuance of the Completion Certificate pursuant to Article 6.9.2; and (b) the date on which the Concessionaire has substantially completed construction, commenced operation of Phase I of the Project and the Completion Certificate has been deemed to have been issued pursuant to Article 6.9.3.

27.   It was accepted in witness statements of the claimants filed in advance of the hearing in 2016 that since the conclusion of the CA and the construction of the Terminal, two shipping lines, Ethiopia Shipping Lines ("ESL") and Messina Shipping Lines ("MSL"), had continued to discharge containers at the Old Port and not at the Terminal. DCT had agreed to this arrangement in 2010 on the basis that it would receive a royalty per container handled in the Old Port, in accordance with Articles 7.1 and 7.1.2(i) of the CA.  On 15 July 2012, at a DCT board meeting, it was agreed in principle that a royalty should be paid in respect of this discharge but no agreement was reached as to quantum and no royalty payments were ever made.  The claimants made the point, at the time of the hearing in 2016, that the container handling at the Old Port was confined to containers from mixed cargo vessels of the two shipping lines.   The respondents' answer to that was that under Article 7.1.1 of the CA "all container handling and related/ancillary activity" by Djibouti or PDSA at the Old Port was to cease.

28.   The tribunal accepts the proposition that under the provisions of Article 7.1.2 (i), if any container handling continued at the Old Port after the "Date of Commercial Operations" (as defined), then "all revenues" from the handling of such container traffic at the Old Port had to be paid to DCT ("the Concessionaire") at the end of the month in which those revenues were earned.  Indeed, at the hearing in 2016 Mr Aboubaker Omar Hadi, the Chairman of DPFZA and the CEO of PDSA, accepted in

cross-examination that insofar as the two shipping lines were continuing to discharge at the Old Port, a fee had to be paid.[5]

29.    However, matters have moved on. On 29 December 2012 Djibouti agreed to sell 23.5% of PDSA to China Merchants Holdings International Co Ltd ("China Merchants"), a global port-operations company which competes with DP World. The claimants informed DP World of this on 17 April 2013. Subsequently, the claimants contracted with China Merchants to develop a new port in Djibouti, the Doraleh Multipurpose Port ("DMP"). Development of the DMP started in 2014 and the port was inaugurated on 24 May 2017. At no time was DCT offered the right to develop this new port (as it should have been, in accordance with Article 3.6.3 of the CA). Nor was DCT's consent given to the development of that port by another body.

30.    The DMP has four separate terminals, able to handle vessels with more than 15,000 containers.[6] However, the evidence of Mr Hadi at the hearing in 2016 was that the DMP's container facility would be used only by ESL and ML and that DMP would not take traffic from the Terminal.[7]

31.    In the joint letter of QE and Gibson Dunn sent to the tribunal dated 13 October 2016, it refers to the three counterclaims of the respondents as being (1) payment of royalties for historic container traffic on mixed cargo vessels handled at the Old Port; (2) payment of royalties for handling future container traffic at DMP from ESL and MSL mixed cargo vessels; and (3) breach of exclusivity (save insofar as that counterclaim was covered by counterclaims (1) and (2)). It should be noted that Article 7.1.2(i) of the CA stipulates that "the Grantor agrees that all the revenues from the handling of containers and all ancillary or related services *at the existing container terminal* from the Date of Commercial Operation till the date of transfer of container handling services shall be paid to the Concessionaire at the end of the Month in which such revenues have been earned". (The tribunal's emphasis). We have emphasised the words "at the existing container terminal" because this makes it clear that any claim for royalties under Article 7.1.2(i) must be confined to container traffic that is still being handled at the Old Port after the Date of Commercial Operation. Under Article

---

[5] Transcript day 2 page 101 lines 5-10.
[6] See respondents' documents **R-330** and **R-323.**
[7] Transcript day 2, page 117 lines 3-19 and page 123 lines 19-24.

7.1.2(i) there is no right to royalties in respect of container operations that are handled at any other container terminal that may be built in contravention of the "exclusivity" provisions in Article 3.6 of the CA.

32.   Thus, as we understand it, in the joint letter, the claimants had agreed that, subject to the terms set out in the letter, the respondents would be able to claim a royalty payment in respect of the handling of ESL and MSL containers at the new DMP, although that was not something to which the respondents were entitled under the terms of Article 7.1.2(i) of the CA.

33.   It was also recorded in the joint letter that, in staying the arbitration concerning the outstanding counterclaims:

"2.   The parties shall negotiate in good faith with a view to reaching a mutually acceptable final and binding settlement of the Counterclaims. Such negotiations shall proceed on the basis of the following heads of terms (without prejudice to the parties' positions should agreement not be reached):

a.   The parties agree that PAID shall pay royalties to DCT in respect of Counterclaim (1) above.[8] The level of that royalty shall be calculated by reference to (a) PAID gross revenue per TEU, less (b) verified stevedoring and storage costs per TEU, (subject to discussion of whether there are other relevant costs to be considered); and such other apportionment thereof as the parties may agree.

b.   The parties agree that PAID shall pay royalties to DCT in respect of Counterclaim (2) above. [9]The level of that royalty shall be the same as that agreed and applicable in respect of Counterclaim (1).

c.   If the level of royalties is agreed, all royalties shall be paid in USD, free of deductions of any kind, to an account to be designated by DCT and upon such other terms as the parties may agree.

d.   If the level of royalties is agreed, PAID shall make available all data and documents reasonably necessary for the Respondents to verify TEU throughput, revenues and relevant costs as agreed, and any such information as may reasonably be necessary to determine the royalty rate or calculate the total amount

---

[8] That is for historic container traffic on mixed cargo vessels handled at the Old Port.
[9] That is for handling future container traffic at DMP from ESL and MSL.

14

of royalties due to DCT.

3.    The foregoing is without prejudice to Counterclaim (3) and any future claim DCT may have in respect of breach of exclusivity. However, if the parties reach agreement on royalties in respect of Counterclaims (1) and (2), Counterclaim (3) will be withdrawn from the present arbitration without prejudice to it being referred to arbitration in the future should containers be handled at the multipurpose port which are not from mixed cargo vessels of Ethiopia Shipping Lines and Messina Shipping Lines and so covered by the royalty agreed in relation to Counterclaim (2). In that event, the parties shall also enter into a tolling agreement in order to suspend the limitation period in respect of Counterclaim (3)."

34.   Ultimately, as we have recorded, the parties did not reach agreement on either of these two counterclaims.

35.   The respondents stated in their Written Submissions dated 2 July 2018 and repeated the point in their "Opening Written Submissions" dated 7 November 2018 that the "limited basis" for the counterclaims (1) and (2) as set out in the joint letter of 13 October 2016 was founded upon the representation made by Mr Hadi in his evidence to the hearing in September-October 2016 that the DMP was not an "additional" container handling facility but only a replacement for the Old Port and only for the two lines ESL and MSL.[10] Mr Hadi's statement appeared to the tribunal at the time to be highly improbable. The tribunal is satisfied that the DMP was designed for and is being and will be used for very large scale container operations far in excess of those that could be handled by the Old Port and that the DMP operations will not be confined to handling container traffic from ESL and MSL.[11]

36.   Even though the respondents had agreed with the claimants to fashion their counterclaim for "royalties" to the diverted container traffic of the two shipping lines ESL and MSL in the manner set out in the joint letter, the tribunal accepts that the respondents are not now bound by this agreement. It is implicit in the joint letter of 13 October 2016 that the agreement of the respondents as to the extent of their royalties counterclaim (1) and (2) was based on the parties reaching an agreement on

---

[10] Transcript day 2 page 113 lines 1-19 and page 115 line 7 to page 116 line 8.
[11] The promotional material referred to by the respondents at the hearing on 9 November 2018 indicated that the DMP had a container capacity of 200,000 twenty-foot equivalent units (TEU). See Respondents' document R-314 "Port Technology, *Must –Watch: Djibouit's Massive Port Expansion* 15 June 2016.

the quantum of those royalties as defined in that letter. The letter states that the negotiations "shall proceed on the basis of the following heads of terms (without prejudice to the parties' positions should agreement not be reached)." Agreement was not reached. Therefore, the parties are entitled to go back to their original positions. The respondents are entitled to sue for all outstanding royalties in accordance with the terms of Article 7.1 and 7.1.2(i) of the CA but for no more.

37.     The tribunal therefore concludes that the respondents are entitled to claim for all unpaid royalties in respect of all revenues earned from the handling of containers of ESL and MSL at the Old Port from 2010 until such time as that practice ceased. Dr Spiller says in his latest report of 30 October 2018[12] that the Old Port was still being used at the end of 2017. However there is no evidence that ESL and MSL container traffic was being handled there then. The tribunal finds, on a balance of probabilities, that the ESL and MSL container traffic was transferred to the DMP once it became operational in 2017. There is no evidence of the precise date for the transfer. It is likely that there was some delay after the inauguration of the DMP on 24 May 2017 and so we find that the transfer was made at the end of June 2017.

**E.      The counterclaim for unpaid royalties: (2) damages: quantum and interest.**

38.     At the time of the hearing in 2016 the parties' experts on damages, Dr Pablo T Spiller for the respondents and Mr Doug Hall for the claimants, had expressed differences on two particular aspects of the royalties counterclaim. First, Mr Hall had done his calculations on the basis that the phrase "all the revenues earned from the handling of containers…" in Article 7.1.2(i) meant all the *net* revenues at the Old Port, that is revenues less operating costs. The respondents challenged this interpretation and submitted then and continue to submit that "all revenues" means the *gross* revenues. Secondly, there was a dispute over the basis on which the revenue figures were to be calculated. Mr Hall presented figures that he claimed represented the actual average revenue per TEU at the Old Port. Dr Spiller challenged them as there was no documentation to support those figures and he said then (and reiterated subsequently) that he has not otherwise been able to verify them.

---

[12] Para 3 footnote 4.

39.    Dr Spiller produced two reports in advance of the hearing in 2016. He has produced two reports since then; one dated 29 June 2018 and the latest, dated 30 October 2018.

40.    First, as to the volume of container traffic at the Old Port, Dr Spiller has relied on publicly available actual traffic volumes for containers at the Old Port from 2011 to 2016. As it is common ground that all the container traffic apart from that connected to ESL and MSL had moved to the Terminal by the end of 2010, it must follow that these figures represent the container traffic at the Old Port of those two lines only. The volume increased from 40,400 TEUs in 2011 to 73,100 TEUs in 2017. The claimants did not respond to the document requests of the respondents showing container traffic at the Old Port for 2017. So Dr Spiller has assumed the same volume of traffic in 2017 as in 2016, viz. 70,000 TEU.

41.    The tribunal accepts those figures as being reasonable. Given our finding above that the ESL and MSL container traffic moved to the DMP at the end of June 2017, this means that the respondents can claim royalties on a volume of 36,600 TEU for 2017.

42.    Secondly, as to the tariff to be used to calculate the revenues, there is evidence of a minute of a DCT board meeting held on 15 September 2017 (respondents' document **R-327)** which states that the tariffs charged at the Terminal were the same as at the Old Port and that the tariff had not changed since 2010. The board minute also states that "the average container revenue at both the terminals continues to be the same at US$ 244.46 per TEU".[13]

43.    In his fourth report, Dr Spiller calculates the DCT average revenue per TEU in US$ to be 184.9 in 2011, 222.3 in 2012, 212.2 in 2103, 215.0 in 2014, 228.0 in 2015, 248.0 in 2016 and 271.2 in 2017[14]. However, given the statement in the DCT board minute of September 2017 and the conclusion of the tribunal that the container traffic of the two lines was transferred to the DMP by the end of June 2017, we conclude that the correct tariff figure to use for the period January to June 2017 is US$ 244.46.

44.    Thirdly, as to the correct interpretation of the phrase "all the revenues" used in Article 7.1.2 (i) of the CA, we have concluded that this phrase must mean all the *gross*

---

[13] Spiller 4th report para 4 footnote 8.
[14] 4th report Table 1 on page 4.

revenues.  On standard principles of construction of commercial documents,  effect should be given to the natural meaning of words in a contract, so "all" should be interpreted as "all" unless there is some reason why, in the context in which it appears, that is not a sensible meaning to give the word. This rule is reflected in Article 1.2 of the CA, headed "Rules of Interpretation". That states, at (iii), "any word or expression used in this Agreement shall, unless defined or construed in this Agreement, bear its ordinary English meaning".  We also note that the definition of "gross revenues" in Article 1 of the CA, states that it "means all the revenues earned to the Concessionaire from the Project in respect of container handling and associated activities, including any ancillary revenues from such container handling activities".  We accept that because a definition of "gross revenues" states it means "all revenues" it does not automatically follow that the reverse is the case. But we think the definition of "gross revenues" as being 'all revenues etc" as quoted above is a strong indicator that "all" means "gross" in Article 7.1.2.(i) as opposed to "net".  We can see valid no counter argument for giving "all the revenues" a different meaning.

45.   On this basis Dr Spiller calculates the total revenues unpaid and owed as being (for the years 2011 to 2017 in US$ millions) 7.5, 10.7, 10.8, 15.2, 16.7, 18.1 and 19. 8. Given our conclusions above, this last figure, for 2017, must be adjusted. The container traffic figure of 73,100 TEUs must be halved to 36,600 TUEs and the average revenue per TEU must be set at US$ 244.46.  The total revenue unpaid and owed for 2017 is therefore US$ 8,947,236.   The total of all these revenues is US$ 87,947,236.

46.   The CA does not state, in Article 7.2.2(i) or elsewhere, the currency in which all the revenues earned from the handling of container traffic etc at the Old Port should be paid to DCT.  Article 11.1 provides for the payment of an annual "royalty" by DCT, as Concessionaire, to the Republic, in consideration of the grant of the Concession. That is to be calculated as the higher of either US$ 6 million or 5% of the Gross Revenue earned by DCT from the operations from the levy of Tariffs during the year. Neither of the definitions of "Gross Revenue" and "Tariffs" indicate the currency in which they are to be calculated. It was assumed by the respondents at the 9 November 2018 hearing that all calculations of revenue or royalties should be made in US dollars. The tribunal is prepared to accept this, given that the only reference to any particular

currency in the CA or the Addendum to it is to US dollars in Article 11. Therefore the tribunal accepts that the debt due of unpaid revenue/royalties is payable in US dollars.

47.   **Interest:** The sum claimed is, as a matter of English law, for a debt due. Article 7.1.2 (i) of the CA stipulates that "all the revenues….shall be paid" so it is a sum of money fixed by that agreement as being payable upon the occurrence of a specified event, viz the continued handling of containers at an existing container terminal after the Date of Commercial Operations has passed.[15]

48.   In his fourth report, Dr Spiller had calculated the total claim for royalties including a sum calculated by using a port operator's weighted average cost of capital or "WACC" on a compounded basis.[16] However, as the tribunal pointed out at the hearing on 9 November 2018,  there was no factual evidence from the respondents as to what the "cost of capital" was to DCT during the relevant period nor any evidence of whether such costs to it were the same as the average to a port operator or above or below them. In the light of this observation, the tribunal suggested that the respondents could claim interest on the royalties figure that the tribunal found was due from the date when the royalties were due. The tribunal invited the respondents to submit figures for both simple and compound interest.  Subsequently, in the Annexure to the letter of QE to the tribunal dated 13 November 2018, at paragraph (e), the respondents stated that they sought simple interest on "all of the judgment debt and damages in respect of which the Award is given at a rate of 10% from the date of the Award or interest from such dates, at such rates and with such rests as it considers meets the justice of the case". Dr Spiller produced a calculation of the royalty counterclaim with simple interest, all calculated in US dollars.[17] However, this assumed that the calculation for the 2017 revenues/royalties due should be based on container traffic for the whole year rather than until the end of June 2017.

49.   This arbitration is being conducted under the LCIA Rules (1998). By Article 26.6, the tribunal has the power to order that simple or compound interest be paid by any party

---

[15] See eg. *Standard Chartered Bank v Dorchester LNG (2) Ltd* [2016] QB 1 at para 38 per Moore-Bick LJ.
[16] Dr Spiller had also used the WACC mechanism in his previous reports: see para 5 footnote 10 of the fourth report.
[17] Annexed to letter from QE to the tribunal dated 13 November 2018.

"on any sum awarded at such rates as the Arbitral Tribunal determines to be appropriate…in respect of any period which the Arbitral Tribunal determines to be appropriate ending not later than the date upon which the award is complied with".

50.     Under Article 7.1.2(i) of the CA all the revenues earned from the handling of containers (and ancillary services) at the Old Port are to be paid to DCT "at the end of the month in which such revenues have been earned". Thus those revenues which have not been paid constitute debts which arose at the end of each month on which the revenues for handling of containers at the Old Port were earned. The claimants have acknowledged that such debts are due, but there has never been any payment.  In these circumstances the tribunal has concluded that it is, in fact, just and appropriate to award compound interest in respect of this claim. For ease of calculation, however, the tribunal has decided that the interest should accrue from the end of each year from 2011 and at yearly rests thereafter for each year's royalties total . In the case of the 2017 revenues/royalties, the period will end on 30 June  2017. Given the tribunal's conclusion that the debt for unpaid royalties is payable in US dollars, interest on that debt should be at a US dollar rate. Accordingly, the tribunal sets the rate of interest at 3% per annum. Compound interest will accrue until the date on which this Award is complied with by the claimants.

51.     Obviously, the respondents have not yet not able to provide figures for compound interest calculated in this way. Therefore the tribunal orders that the respondents must produce the figures of compound interest (showing the full working of how the figures are calculated) within 10 days of the production of this Award to the parties. The tribunal will give the claimants 7 days to respond and then will produce a further Award setting out its award of the amount of compound interest on the royalties claimed up to the time of this Award.

**F.      The counterclaim for breach of the "exclusivity" provisions:  (1) the CA terms and the facts.**

52.     Articles 3.6 and 3.7 of the CA provide as follows:

### Article 3.6  Exclusivity

3.6.1   The Grantor shall, itself or through PAID, cause the entire container traffic (including any domestic or combi vessels) at the existing container

20

terminal at the Port to be shifted to the Doraleh Container Terminal, within 30 (thirty) days from the Date of Commercial Operations of Phase I of the Project.

3.6.2   The Grantor agrees that after the Date of Commercial Operations of Phase I of the Project and during the entire Operations Period, it shall not and shall cause the Authority and PAID not to directly or indirectly operate or commission any existing or additional facilities (including the existing container terminal at the Port) within the Republic of Djibouti for handling containers, without the prior written consent of the Concessionaire.

3.6.3   Subject to the provisions of Articles 3.6.1 and 3.6.2 above, the Grantor agrees that in the event that it or the Authority or PAID decide or propose to develop any additional container handling facilities (including at the existing container terminal at the Port, after the Date of Commercial Operations) it shall first offer the Concessionaire the right to develop such additional container handling facilities, on such terms and conditions as may be agreed between the Parties and being no less favourable than the terms of this Agreement.

3.6.4   If any other port or container facility is developed in the Republic of Djibouti by the Grantor or any other third party pursuant to the provisions of this Article 3.6 receives more favourable treatment or privileges from the Grantor and/or the Authority and/or PAID than are offered or extended to the Doraleh Container Terminal and/or the Concessionaire under this Agreement, then the Grantor confirms that equivalent favourable treatment or privileges shall at the same time be offered or extended to the Doraleh Container Terminal and/or the Concessionaire.

53.   Article 4.1.1 defines the "Concession Period" and stipulates that the CA will be in force for 30 years from the "Effective Date" unless extended or terminated earlier in accordance with the terms of the CA. Article 4.1.2 provides that the Concession Period will be automatically renewed for two additional periods of 10 years each, "unless the Concessionaire notifies the Grantor otherwise at least (*) Months prior to the end of the original Concession Period or (*) Months prior to the completion of the first renewal period". The period to be put in where there was a "star" was never added.

54.   The claimants have asserted that the CA has been terminated, but in our first Partial Final Award this tribunal rejected the claimants' arguments that they were entitled to terminate the CA (see paragraphs 61 and 64 of that Award) and the claimants have not raised new arguments in this part of the arbitration to suggest that they are entitled to terminate the CA before its agreed term. Therefore, for present purposes, it must

follow that the Concessionaire's right to exclusivity set out in Article 3.6.1 of the CA extends until 2056.

55.     As recorded above, the respondents concluded an agreement with China Merchants for the development of the DMP in 2013. They did so without offering DCT the opportunity to carry out such a development. The respondents therefore were in breach of the terms of both Articles 3.6.1 and 3.6.3 of the CA with respect to the development of the DMP.  If, as a result of those breaches, the respondent DCT can prove that it has suffered loss, it is entitled to damages.

56.     The claimants are also now developing another terminal, the Djibouti International Container Terminal ("DICT"). The facts concerning this development are as follows: in a letter dated 29 March 2016 from Mr Hadi in his capacity of Chairman of the DPFZA to Mr Suhail Albanna, chairman of the board of DCT, Mr Hadi announced the development project of a "second container terminal at Djibouti with 20 meters depth and two millions TEUs capacity". The letter invited DCT "to participate on the project, which the feasibility study will be completed within the next three months and the construction will start in six months".  The letter noted that, as stipulated in Article 3.6 of the CA "the commissioning or operating of any new container terminal is subject to the right of first refusal granted to DCT". The letter continued "we look forward to receiving your response".

57.     Mr Albanna responded to Mr Hadi in a letter dated 6 April 2016, confirming that DCT would wish to build and operate "any additional container handling facilities in Djibouti on terms no less favourable than the 2006 Concession Agreement as and when such facilities are required". The letter continued by saying that DCT believed that the current terminal container handling facilities were adequate to meet demand in the medium term and so "would wish to understand the reasons for proposing an additional terminal at this time". The letter concluded by saying that "pending full consideration of the proposals, DCT reserves its right to withhold its consent to the development of the new container port under clause 3.6.2 of the 2006 Concession Agreement". In a further letter (undated but apparently sent at the beginning of August 2016) to Mr Hadi, Mr Albanna again requested a copy of the feasibility study which had been commissioned and asked when this would be provided.  Mr Hadi replied to this letter on 15 August 2016 and stated that the "feasibility study is currently going

on and will be completed within the upcoming weeks" and that "we will certainly share it with you as soon as it is finalised".

58.    The feasibility study was provided to DCT in April 2017. In an email from Mr Albanna to Mr Hadi of 8 May 2017, DCT stated that it was "willing to develop and operate the new terminal once we complete Phase 2 of the DCT existing concession". The email continued: "Alternatively, should Djibouti Government wish to proceed with development of new container terminal instead of Doraleh Phase 2 extension, we will align our plans and invest with the government in the new container terminal to meet government directions. Please advise". The email ended by reminding Mr Hadi of DCT's rights under the terms of Article 3.6.2 of the CA "which are reserved". Then in an email sent by Mr Hadi to Mr Albanna on 19 May 2017, he stated that "Djibouti government is seriously considering to give its DCT share to DP World, for free; and don't envisages to any future business development with DP World".

59.    On the day that the DMP was inaugurated, 24 May 2017, a further agreement with the China Merchants Group was signed for the development of a second container port, the DICT, as set out in an article published on the website of the Djibouti embassy to Ethiopia dated 24 November 2017.  As reported by Reuters on 27 March 2018, Mr Hadi announced that the DICT would have an initial capacity of 2.4 million TEUs, rising to 4 million TEUs and that the facility would cost US$660 million and would be built in partnership with the French shipping group CMA-CGM.

60.    The respondents submit that the claimants are in breach of Articles 3.6.2 and 3.6.3 of the CA in respect of the development of both the DMP and the DICT. They seek declarations in respect of both breaches. However, for the present they seek damages only in respect of the former breach.

**G.    The counterclaim for the breach of the "exclusivity" provisions: (2) was the Republic in breach of the terms of clauses 3.6.2 and/ or 3.6.3 of the CA in respect of the development of the DMP and/or the DICT?**

61.    **The DMP:** In respect of the development of the DMP facility the facts are clear.  At no stage before the decision was made to go ahead with that facility with China Merchants did "the Grantor", ie Djibouti and first claimant in this arbitration, offer "the Concessionaire", ie DCT and the Third Respondent in this arbitration, the right

to develop the proposed container facilities at the DMP. Djibouti was therefore in breach of clause 3.6.3 of the CA in respect of the development of the DMP. Further, by allowing the development of the DMP terminal to go ahead, Djibouti was in breach of clause 3.6.2 of the CA. It failed in its obligation not to operate or commission "additional facilities for the handling of containers, in the form of the DMP; nor did the Republic "cause" the DPFZA or PAID/PDSA not to operate or commission those additional facilities.

62.    **The DICT:** At first Djibouti did take steps towards offering the DCT the right to develop the DICT facilities, but the offer went no further than giving the DCT the right to look at the feasibility studies when they were complete. However, once the DCT were given a copy of the feasibility study in April 2017 and the DCT had indicated that it was willing to develop and operate the proposed new terminal, once it had finished Phase 2 of the Terminal, ie the existing Doraleh terminal, Djibouti made it clear in its letter of 19 May 2017 that it "did not envisage any future business development with DP World". That is an unequivocal statement that Djibouti would not abide by its obligations in both clause 3.6.3 and clause 3.6.2. Even if that statement was not, the announcement of the new development with China Merchants for the development of the DICT amounted to clear indications not to be bound by either clause.

**H.    The counterclaim for damages for breach of the "exclusivity provisions": (3) on what basis should the damages be calculated?**

63.    The respondents stated in their "Opening Submissions" of 7 November 2018 (para 32) that they would confine their present claim for damages for breaches of clauses 3.6.2 and 3.6.3 to losses resulting from the development of the DMP facility.   The respondents reserved their right in future to claim damages arising from losses to DCT resulting from the development of the DICT. The respondents have said that there is insufficient data available for the respondents' expert, Mr Spiller, to compute DCT's losses caused by the development of the DICT.   The respondents complain that the claimants have failed to respond to the respondents' requests for production of documents on this issue. They reserve the right to pursue a claim for damages caused by the development of the DICT.

24

64.   The tribunal therefore reserves the right to deal with any further claim for damages for losses suffered by DCT relating to the development of the DICT. In this award the tribunal will confine itself to the issue of what damages can be recovered as a consequence of the Republic being in breach of clauses 3.6.2 and 3.6.3 in respect of the DMP development.

65.   In English law damages for breach of contract are intended to put the claimant in the financial position it would have been in had there been no breach. This involves two exercises. First, evaluating the profits that the claimant would have made had there been no breach. Secondly, evaluating the profits (if any) that it actually made. The difference between the two (if any) will constitute the measure of damages that can be claimed.

66.   In this case, therefore, the first exercise involves a calculation of the gross and net revenues that DCT would have earned from the Terminal (ie the Doraleh container terminal) had there been: (i) no development of the DMP facility; and (ii) the entire container traffic at the Port was handled at the Terminal starting 30 days from the date of Commercial Operations of Phase 1 of the Doraleh terminal project; and (iii) there was no other operation of any existing or additional container facilities in Djibouti. This last assumption is made on two bases. First, under clause 3.6.2 of the CA no further container handling facility within Djibouti could be developed without the prior consent of DCT. Secondly, the tribunal is satisfied on the evidence on DCT's reaction to the proposed development of the DICT that DCT would not have consented to any other container handling facility being developed unless it was done by DCT itself. The second exercise requires a calculation of the gross and net revenues that DCT would have earned from the Terminal if the container traffic is divided between the Terminal and DMP for the contractual period of exclusivity.

67.   In Table 3 of his fourth report dated 30 October 2018 Mr Spiller has set out a calculation of the total container traffic that would have gone to the Terminal from 2018 until 2026 (in thousands of TEUs) on two different bases. First, that there was exclusivity and secondly, that there was no exclusivity and that DMP is developed as proposed. For the latter exercise, Mr Spiller has assumed that the split of traffic between the two container terminals will be in proportion to their capacities. DCT's current capacity at the Terminal is 1.25 million TEUs. That of DMP is intended to be

25

220,000 TEUs. So Mr Spiller has assumed that the Terminal and DMP would share the container traffic in any one year in the ratio of 5.68:1 in favour of the Terminal. It could well be that the volume of container traffic going to DMP would be greater, but it seems to the tribunal that it is unlikely to be less than the figure assumed by Mr Spiller. The tribunal can only deal in probabilities and it finds that it is probable that the container traffic would be divided in this manner up until 2026.

68.   Mr Spiller forecasts, on the basis of past increases in container traffic at the Terminal up until 2017, that the current capacity of the Terminal would be fully utilised by 2023 with exclusivity and would be fully utilised by 2026 without exclusivity. After 2026, without any further expansion of the container facilities at the Terminal, Mr Spiller calculates that the net revenues of DCT from the Terminal facility would be the same whether or not there was exclusivity. Therefore, on the basis of no expansion of the Terminal facilities, DCT would suffer no further losses of profit thereafter. The loss in net revenues over the period 2018 to 2026, assuming Mr Spiller's figures for additional fees, additional costs and additional capital requirements, which the tribunal accepts as being reasonable, as therefore as set out in TABLE A below, which is an adaptation of Mr Spiller's Table 3 in his fourth report.

69.   Thus the total loss in net revenues/profit over that period, assuming *no further expansion* of the Terminal facility, is calculated at US$229.2 million, which is the total of the individual years figures on "Loss Net Revenues" line of TABLE A below.

**TABLE A**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|
| Traffic Djibouti Total (000s TEU) | 1,123.7 | 1,238.0 | 1,355.7 | 1,449.4 | 1,535.8 | 1,622.0 | 1,707.5 | 1,791.3 | 1,925.7 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| DCT With Exclusivity (000s TEU) | 1,123.7 | 1,238.0 | 1,355.7 | 1,449.4 | 1,535.8 | 1,578.2 | 1,578.2 | 1,578.2 | 1,578.2 |
| DCT Without Exclusivity (000s TEU) | 955.8 | 1,053.0 | 1,189.8 | 1,272.1 | 1,347.9 | 1,423.6 | 1,498.6 | 1,572.1 | 1,578.2 |
| **Loss in Traffic (000s TEU)** | **167.9** | **185.0** | **165.9** | **177.3** | **187.9** | **154.6** | **79.7** | **6.1** | **0.0** |
| Loss in Net Revenues | | | | | | | | | |
| Average Avenues (USD/TEU) | 277.8 | 283.7 | 290.2 | 296.6 | 303.0 | 309.7 | 316.3 | 323.1 | 330.1 |
| Loss in Revenues (USD Million) | 46.6 | 52.5 | 48.1 | 52.6 | 56.9 | 47.9 | 25.2 | 2.0 | 0.0 |
| Additional Fees (USD Million) | 4.7 | 5.2 | 4.8 | 5.3 | 5.7 | 4.8 | 2.5 | 0.2 | 0.0 |
| Additional Costs (USD Million) | 9.7 | 11.0 | 10.1 | 11.0 | 12.0 | 10.1 | 5.3 | 0.4 | 0.0 |
| Additional Working Capital Requirements | -0.9 | -0.1 | 0.1 | -0.1 | -0.1 | 0,2 | 0.5 | 0.5 | 0.0 |
| **Loss Net Revenues (USD Million)** | **33.2** | **36.4** | **33.2** | **36.4** | **39.4** | **32.8** | **16.9** | **0.9** | **0.0** |
| *Discount Rate: WACC = 10.9%* | | | | | | | | | |
| *Discount Factor* | *1.04* | *0.93* | *0.84* | *0.76* | *0.68* | *0.62* | *0.56* | *0.50* | *0.45* |
| **Exclusivity Counterclaim (USD Millions as of October 31, 2018)** | | | | | | | | | **180.9** |

70.   **Counter arguments.** Mr Spiller points out that currently DMP is handling container traffic only from ESL and MSL. Although the evidence of Mr Hadi at the 2016 hearing was that DMP would only replace the Old Port and would not handle any other container traffic, the tribunal rejects that evidence. It would not make economic sense to develop a new container facility with a container handling capacity of 220,000 TEUs and four separate terminals for just that comparatively small amount of traffic. The data shows that in 2016 the Old Port handled 73,1000 TEUs of container traffic from ESL and MSL. It would be illogical to build an entirely new terminal at DMP to handle only the ESL and MSL container traffic, even assuming that traffic were to expand somewhat. Moreover, the tribunal was shown materials that marketed the DMP in Ethiopia and elsewhere, emphasising its container handling capabilities. Those advertisements would be pointless if the intention had been to confine the use of the DMP to handling the ESL and MSL traffic.

71.   The tribunal is therefore satisfied that the DMP will handle small container-only ships consistent with its physical infrastructure and capacities and will also handle containers from shipping lines other than ESL and MSL. We proceed on that basis.

72.   Mr Spiller also notes that the claimants' expert, Mr Hall, challenged Mr Spiller's assessment of the growth of container traffic over the coming years. Mr Spiller has assumed a growth in container traffic to Djibouti of between 7.5-8%. Mr Hall's view was that it is reasonable to assume, based on historic performance, that there would be a growth in container traffic to Djibouti of 3.5% per annum, but no more. Mr Spiller points out, however, that independent studies predict that Djibouti traffic will grow on

average at 7% between 2017-2025, largely driven by growth in the Ethiopian economy.[18] The tribunal rejects Mr Hall's view on the growth of container traffic in Djibouti.

73.     Mr Hall also took the view that there would be no increase in average earnings per TEU. Mr Hall's opinion is that DCT's EBITDA margin is exceptional for a ports operator. That may be so, but the tribunal accepts Mr Spiller's explanation for it. There is a combination of the following factors:  the strategic location of the Terminal at Doraleh; the advanced technology used at the Terminal; the fact that the proportion of transhipments at the Terminal facility is around 25% of the total movements, whereas characteristically it is nearer 60-70% in other ports. The tribunal also notes that the EBITDA has been consistent since the start of operations of the Terminal at Doraleh.[19]

74.     **Possible expansion of the Terminal facility?** The next question is whether the damages from loss of container traffic from the Terminal to DMP should be calculated on the basis that there would have been *no further expansion* of the Terminal by DCT or on the basis that the facility would have been enlarged. If the latter, it is necessary to calculate what effect that would have had on losses suffered by DCT resulting from the Republic's breach of clauses 3.6.2 and 3.6.3 of the CA.

75.     The respondents argued at the hearing on 9 November 2018 that, on the balance of probabilities, the facilities at the Terminal would have been expanded by DCT. They submitted that this would have been a logical commercial decision for several reasons. First, demand has been rising and will continue to do so; secondly, the container handling business at the Terminal at Doraleh is very profitable, (as the claimants accepted at the 2016 hearing) thus giving an incentive to DCT to expand; thirdly, DCT had already planned to extend its yard and quay capacity because the Doraleh terminal was already operating at 80% capacity; fourthly, Article 3.5 of the CA gives DCT an option to develop a "Phase II" at the Terminal "taking into consideration the utilisation of the Throughput capacity of Phase 1"; and lastly, it is clear from DCT's reaction to the proposal of Djibouti to develop the DICT that DCT was anxious to expand,

---

[18] See Spiller 4th report para 14 and footnotes 27 to 34.
[19] See Spiller 4th report para 16 and footnotes 37 and 38.

although at that stage it contemplated this would be through a Phase II at the Terminal at Doraleh.

76.    The tribunal accepts those submissions and finds, on a balance of probabilities, that had there been no breach of the exclusivity provisions of the CA, then DCT would have expanded the container handling capacity at the Terminal.

77.    Therefore the damages which DCT is entitled to claim by virtue of the Republic's breach of he "exclusivity" provisions in clauses 3.6.2 and 3.6.3 of the CA must be based on the probabilities that (i) the DMP would be used for all types of container traffic, not just those connected to ESL and MSL; and (ii) if there had been no breach, DCT would have expanded the Terminal facilities to meet increasing demand.

I.    **The counterclaim for breach of the "exclusivity" provisions: (4) quantum and interest, based upon the expansion of the Terminal facility.**

78.    To summarise: the tribunal will award damages on the following bases: (i) by calculating the total TEU container traffic to Djibouti during the period 2018 to the end of the concession, viz 2056; (ii) by calculating what traffic would be handled by DCT at the Terminal assuming exclusivity and assuming that the facilities were expanded there when required, ie, on Mr Spiller's calculations, from 2023 onwards; (iii) by calculating what traffic would be handled by DCT at the Terminal (assuming further expansion) if there was no exclusivity; thus producing (iv) - as the difference between (ii) and (iii)) - the loss in traffic in TEUs for each year from 2018 to 2056 and in total; (v) by calculating the average revenue in US$ per TEU per year from 2018 until 2056; (vi) thus producing the loss in gross overall revenues per year and in total (by multiplying ((iv) by (v) above); then (vii) deducting from that figure the additional fees and additional costs that DCT would incur in order to earn the gross revenue; and (viii) deducting the additional working capital requirements and the additional capital expenditure ("CAPEX") needed, particularly at the time of the expansion, so producing (ix) a loss of net revenue per year from 2018 to 2056 and the total for those years (being (vi) minus (vii) and (viii) above). Mr Spiller produced these figures in Table 4 of his fourth expert report, and that Table is the basis of TABLE B set out below. For the reasons given in paragraphs 70-73 above, we would not have accepted the arguments that the claimants might have made about (a) the rate of expansion of container traffic to Djibouti; and (b) the average revenue per TEU over the period. We

therefore accept the figures set out in Mr Spillers' Table 4, which are reproduced in TABLE B below.

79.    Mr Spiller accepted that a discount rate had to be applied to the figures for loss of net future revenue for the period from 2019 to 2056, because any sum in damages was to be received now whereas the net revenue that DCT would have received would have been over a period of 38 years. Mr Spiller therefore applied a discount rate to each future year's lost net revenue. He based the discount factor on a figure for DCT's weighted average cost of capital or "WACC" which he calculated to be 10.9%. Although we have not been shown Mr Spiller's underlying calculations that produce the figures for the "Discount Factor" in Table B, (set out below), they appear inherently reasonable and we accept both the rationale and the figures.

80.    On this basis, the total figure for damages for breach of the exclusivity provisions in the CA is US$385.7 million. The calculations, which we have explained in paragraphs 78-79 above, are summarised in Table B below

**TABLE B**

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | ... | 2056 |
|---|---|---|---|---|---|---|---|---|---|---|
| Traffic | | | | | | | | | | |
| Djibouti Total (000s TEU) | 1,123.7 | 1,238.0 | 1,355.7 | 1,449.4 | 1,535.8 | 1,622.0 | 1,707.5 | 1,791.3 | ... | 6,530.3 |
| DCT With Exclusivity (000s TEU) | 1,123.7 | 1,238.0 | 1,355.7 | 1,449.4 | 1,535.8 | 1,622.0 | 1,707.5 | 1,791.3 | ... | 6,530.3 |
| DCT Without Exclusivity (000s TEU) | 955.8 | 1,053.0 | 1,189.8 | 1,272.1 | 1,347.9 | 1,423.6 | 1,498.6 | 1,572.1 | ... | 6,530.3 |
| **Loss in Traffic (000s TEU)** | **167.9** | **185.0** | **165.9** | **177.3** | **187.9** | **198.4** | **208.9** | **219.2** | ... | **220.0** |
| | | | | | | | | | | |
| Loss in Net Revenues | | | | | | | | | | |
| | | | | | | | | | | |
| Average Avenues (USD/TEU) | 277.8 | 283.7 | 290.2 | 296.6 | 303.0 | 309.7 | 316.3 | 323.1 | ... | 624.8 |
| Loss in Revenues (USD Million) | 46.6 | 52.5 | 48.1 | 52.6 | 56.9 | 47.9 | 25.2 | 2.0 | ... | 137.5 |
| Additional Fees (USD Million) | 4.7 | 5.2 | 4.8 | 5.3 | 5.7 | 4.8 | 2.5 | 0.2 | ... | 13.7 |
| Additional Costs (USD Million) | 9.7 | 11.0 | 10.1 | 11.0 | 12.0 | 10.1 | 5.3 | 0.4 | ... | 31.9 |
| Additional Working Capital Requirements | -0.9 | -0.1 | 0.1 | -0.1 | -0.1 | 0.2 | 0.5 | 0.5 | | 3.3 |
| Additional CAPEX (USD Million) | 0.0 | 0.0 | 0.0 | 111.6 | 0.0 | 0.0 | 3.9 | 0.0 | | 0.0 |
| **Loss Net Revenues (USD Million)** | **32.3** | **36.3** | **33.3** | **-75.3** | **39.3** | **42.4** | **41.6** | **48.7** | ... | **91.8** |
| *Discount Rate: WACC = 10.9%* | | | | | | | | | | |
| *Discount Factor* | *1.04* | *0.93* | *0.84* | *0.76* | *0.68* | *0.62* | *0.56* | *0.50* | ... | *0.02* |
| **Exclusivity Counterclaim (USD Millions as of October 31, 2018)** | | | | | | | | | | **385.7** |

81.    **Interest:** The respondents claim post-award interest on the damages awarded for breach of the exclusivity provisions of the CA. They submit that it would be reasonable to award simple interest at the rate prevailing in Djibouti "during the relevant period", which they say is reported to be between 10-12 per cent.

82.     The tribunal accepts that interest should be awarded on the sums that we have held are due as damages for breach of the exclusivity clauses of the CA.  These damages are for loss of future profits that DCT would have made from revenues made pursuant to the CA if there had been no breach of those terms.  Under the provisions of LCIA Rules Article 26.6 the tribunal has decided that it will award simple interest on the principal sum of US$ 385.7 million. However, the tribunal does not accept the submission that the interest rate should be in accordance with the interest rates prevailing in Djibouti "at the relevant time". Given the respondents' assumption, which the tribunal accepts, that damages should be awarded in US dollars, it is logical that the interest rate should be a US dollar rate.  The tribunal sets it at 3% per annum. It will be payable on the principal sum of US$385.7 million from the date of this award until compliance with it.

## J.     Relief sought by the respondents.

83.     The relief sought by the respondents has been set out at paragraph 24 above. The relief falls into five groups. In summary, these are, first, declarations in favour of the respondents that all of the claimants have breached Articles 3.6.2 and 3.6.3 of the CA in developing and operating the DMP and the DICT. Secondly, a declaration in favour of all the respondents against all the claimants that they are in breach of their obligation under Articles 7.1.1 and 7.1.2(i) of the CA to pay the respondents royalties for container traffic diverted to other ports from the Terminal. Thirdly, orders that all the claimants pay: (a) damages in the principal sum of US$ 385.7 million to the third respondents for losses resulting from the breaches of Articles 3.6.2 and 3.6.3 of the CA, but only in respect of losses resulting from breaches in developing and operating the DMP.  (The respondents expressly reserved the right to claim damages in respect of breaches in developing and operating the DICT until a later date), and (b) an amount of US$ 148.8 million in respect of the unpaid royalties due under Articles 7.1.1 and 7.1.2(i) of the CA.  Fourthly, interest (which the respondents claimed under either *section 49* of the Arbitration Act 1996 or Article 26.4 of the LCIA Rules (2014[20]) on the damages and unpaid royalties claims.  Fifthly, that the claimants pay the respondents the costs incurred by the respondents in connection with the arbitration of

---

[20] Although the respondents referred to the LCIA Rules 2014,  this arbitration was conducted under the 1998 Rules but the effect of the Rules is the same.

the counterclaims, including the costs of the tribunal, the LCIA and the respondents legal and other professional fees. The respondents state that their legal and other professional fees amount to £492,336.96.

84. As the Recital to the CA makes clear, the parties to the agreement are Djibouti, DCT and Dubai (International) Djibouti FZE, the last being called a "confirming party to the agreement". As all the relief sought arises out of the terms of the CA, only the parties to it can claim and be subject to orders for declarations in respect of rights and orders to pay debts due under the CA or damages in respect of breaches of its terms.

85. Accordingly, the tribunal will make the orders set out in the operative part of this Award below in favour of and against the parties to the CA in the terms identified.

### K.    Costs

86. At the end of the hearing on 9 November 2018 the respondents produced to the tribunal a summary schedule of their legal and other professional fees incurred in connection with the arbitration of the counterclaims. The total amounted to £492,336.96. The tribunal ordered that the schedule be sent to the claimants and that the claimants would have 14 days in which to respond with any comments. The tribunal has received none. The tribunal finds these legal and professional fees (which include sums for Mr Spiller's fees as expert, costs of transcription at the hearing and the hearing room charges) to be reasonable.

87. The claimants resisted the respondents' counterclaims, although the claimants did not take any active part in this arbitration once GD ceased to be instructed. The tribunal has concluded that the usual rule, that costs should follow the event, should apply in this case. As the claimants not only lost their claim but also opposed the counterclaims and the tribunal has made substantial awards in relation to the three outstanding counterclaims, we determine that the claimants must bear the outstanding costs of this costs of the arbitration as well as the legal and professional fees of the claimants.

88. The outstanding costs or this arbitration from the date of the first Partial Final Award of this tribunal dated 20 February 2017 (other than the legal and professional fees referred to in paragraph 88 above) up to the date of this Award, have been determined by the LCIA Court, pursuant to Article 28.1 of the LCIA Rules, as follows:

LCIA Administration charge: £10,011.43

Tribunal's fees: £73,545.81

Total costs to the issue of this Award: £83,777.66

**WE, Peter Leaver QC, Leonard, Lord Hoffmann** and **Sir Richard Aikens,** having read and heard the evidence and the parties written and oral submissions made to us and having carefully considered them and for all the reasons stated above, **MAKE OUR THIRD FINAL PARTIAL AWARD AS FOLLOWS:**

(1)    We grant **DECLARATIONS** in favour of **DUBAI (INTERNATIONAL) DJIBOUTI FZE** (second named respondent) and **DORALEH CONTAINER TERMINAL SA** (third named respondent) and against **THE REPUBLIC OF DJIBOUTI** that:

      (a)    **THE REPUBLIC OF DJIBOUTI** (first named claimant) has breached Articles 3.6.2 and 3.6.3 of the Concession Agreement in developing, commissioning and operating the Doraleh Multipurpose Port; and

      (b)    **THE REPUBLIC OF DJIBOUTI** (first named claimant) has breached Article 3.6.2 and 3.6.3 of the Concession Agreement in their proposal to develop and entered into a contract to develop the Djibouti International Container Terminal as additional container handling facilities within the Republic of Djibouti, without having first offered **DORALEH CONTAINER TERMINAL SA** (the third named respondent) the opportunity to exercise its right to develop such a facility.

(2)    We grant **DECLARATIONS** in favour of **DUBAI (INTERNATIONAL) DJIBOUTI FZI** (second named respondent) and **DORALEH CONTAINER TERMINAL SA** (third named respondent) and against **THE REPUBLIC OF DJIBOUTI** that **THE REPUBLIC OF DJIBOUTI** has failed in its obligation, pursuant to Articles 7.1.1 and 7.1.2(i) of the Concession Agreement, to pay to **DORALEH CONTAINER TERMINAL SA** sums by way of royalties due under

33

those Articles being revenue lost to **DORALEH CONTAINER TERMINAL SA** for container traffic diverted to other ports from the Terminal.

(3)    We order that **THE REPUBLIC OF DJIBOUTI** (first named claimant) do pay to **DORALEH TERMINAL SA** (third named respondent) the sum of US$ 148.8 million being sums due under Articles 7.1.1 and 7.1.2(i) of the Concession Agreement.

(4)    We order that **THE REPUBLIC OF DJIBOUTI** (first named claimant) do pay to **DORALEH TERMINAL SA** (third named respondent) interest on the sum of US$ 148.8 million, such interest to be paid in respect of the revenue lost for each year from 2011 to 2016 and for 2017 from 1 January to 30 June (inclusive), to be compounded at yearly rests from the date when the principal sum became due and payable.  Such interest is to remain payable until the whole of the principal sum due under (3) above has been paid.

(5)    We order that **THE REPUBLIC OF DJIBOUTI** (first named claimant) do pay to **DORALEH TERMINAL SA** (third named respondent) the sum of US$ 385.7 million being damages for the breach of Articles 3.6.2 and 3.6.3 of the Concession Agreement in respect of the development, commissioning and operation of the Doraleh Multipurpose Port.

(6)    We order that **THE REPUBLIC OF DJIBOUTI** (first named claimant) do pay to **DORALEH TERMINAL SA** (third named respondent) simple interest on the sum of US$ 385.7 million referred to in (5) above at the rate of 3% per annum. Such interest will be payable from the date of this Award until the whole of the principal sum due under (5) above has been paid.

(7)    We order that **THE REPUBLIC OF DJIBOUTI** (first named claimant) must pay:

(a)    The legal and professional fees of the respondents incurred in connection with the arbitration of the counterclaims,  which we assess at £492,336.96 and

(b)    The LCIA administration charges and the tribunal's fees of this Award, together totalling £83,777.66.

(8)   We reserve to ourselves all outstanding matters arising out of or in connection with this reference, including but not limited to the amount of compound interest due, up to the date of this Award, under (4) above and any further counterclaim for damages by the respondents in relation to the declaration made at (1)(b) above.


Seat of the Arbitration:  London, England.


Dated:  March 2019


Signed:  .......................................     .........................................

          Peter Leaver QC                        Lord Hoffmann


..........................................

          Sir Richard Aikens