**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DORALEH CONTAINER TERMINAL SA,

*Petitioner*,

v.

REPUBLIC OF DJIBOUTI,

*Respondent*.

Case No. 1:20-cv-02571-TFH

**THE REPUBLIC OF DJIBOUTI'S**
**<u>MEMORANDUM OF LAW IN OPPOSITION TO THE PETITION</u>**

Matthew M. Madden (D.C. Bar No. 991139)
Jason A. Shaffer (D.C. Bar No. 888314607)
KRAMER LEVIN NAFTALIS &
    FRANKEL LLP
2000 K Street N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
mmadden@kramerlevin.com

*Counsel for Respondent the Republic of Djibouti*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

      A.    The Republic Created DCT to Develop and Operate the Doraleh Container Terminal ................................................................................................................... 3

      B.    The Republic Commences Arbitration Against DCT and DP World, and the Arbitral Tribunal Stays DCT's and DP World's Counterclaims ........................... 3

      C.    DP World and DCT Declined to Renegotiate the Concession Agreement............. 4

      D.    The Djibouti District Court Appointed a Provisional Administrator with Exclusive Authority to Direct DCT's Affairs ........................................................ 5

      E.    Arbitration Proceedings on DCT's and DP World's Counterclaims Resumed Without Notice to the Republic ................................................................................. 6

      F.    DP World's Counsel Filed the Petition in DCT's Name ...................................... 7

ARGUMENT ....................................................................................................................... 9

I.    THE COURT SHOULD DISMISS THE PETITION FOR LACK OF JURISDICTION AND STANDING BECAUSE DCT DID NOT AUTHORIZE IT ........ 9

      A.    The Court Lacks Jurisdiction Over a Petition Not Actually Made by the "Party to the Arbitration" to Which the Relevant Awards Were Made.................. 9

      B.    DCT Did Not Authorize the Petition ................................................................... 11

      C.    The Court's Lack of Jurisdiction Cannot Be Waived and Was Not Waived........ 16

II.    THE COURT SHOULD DENY THE PETITION UNDER THE NEW YORK CONVENTION IF IT CONCLUDES THAT IT HAS JURISDICTION ........................ 18

      A.    The Republic Received Inadequate Notice During the Arbitration and Could Not Defend Against the Counterclaims That Produced the Awards .................... 18

      B.    Enforcing the Awards Would Be Contrary to United States Public Policy.......... 21

CONCLUSION..................................................................................................................... 22

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aetna Ins. Co. v. Kennedy*,
301 U.S. 389 (1937)..............................................................................................................21

*Arbaugh v. Y&H Corp.*,
546 U.S. 500 (2006)........................................................................................................9, 16

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964)..............................................................................................................14

*Belize Bank Ltd. v. Gov't of Belize*,
191 F. Supp. 3d 26 (D.D.C. 2016) ......................................................................................18

*Bellevue Gardens, Inc. v. Hill*,
297 F.2d 185 (D.C. Cir. 1961)..............................................................................................14

*Booth v. Fletcher*,
101 F.2d 676 (D.C. Cir. 1938) .............................................................................................11

*CC/Devas (Mauritius) Ltd. v. Republic of India*,
No. 1:21-cv-106-RCL, 2022 WL 873620 (Mar. 24, 2022) ................................................13

*Chicago & Grand Trunk Ry. v. Wellman*,
143 U.S. 339 (1892)..............................................................................................................10

*City of Harper Woods Emps.' Ret. Sys. v. Olver*,
589 F.3d 1292 (D.C. Cir. 2009) ...........................................................................................11

*Cowin v. Bresler*,
741 F.2d 410 (D.C. Cir. 1984) .............................................................................................11

*D.H. Overmyer Co. v. Frick Co.*,
405 U.S. 174 (1972)..............................................................................................................21

*Dep't of Water & Power of City of Los Angeles v. Anderson*,
95 F.2d 577 (9th Cir. 1938) .................................................................................................11

*Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*,
225 F. Supp. 3d 18 (D.D.C. 2014) .......................................................................................20

*Fuentes v. Shevin*,
407 U.S. 67 (1972)...........................................................................................................20, 21

ii

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Hardy Expl. & Prod. (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Gas*, 314 F. Supp. 3d 95 (D.D.C. 2018)..................................................22

*Labovitz v. Wash. Times Corp.*,
900 F. Supp. 500 (D.D.C. 1995)..................................................11

*In re Nat'l Nurses United*,
47 F.4th 746 (D.C. Cir. 2022)..................................................16

*Ohio Bell Tel. Co. v. Pub. Utilities Comm'n of Ohio*,
301 U.S. 292 (1937)..................................................21

*Osborn v. Bank of the United States*,
22 U.S. (9 Wheat.) 738 (1824)..................................................10

*Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (Rakta)*,
508 F.2d 969 (2d Cir. 1974)..................................................18

*Raines v. Byrd*,
521 U.S. 811 (1997)..................................................10

*Samantar v. Yousuf*,
560 U.S. 305 (2010)..................................................14

*Simon v. E. Ky. Welfare Rts. Org.*,
426 U.S. 26 (1976)..................................................10

*Underhill v. Hernandez*,
168 U.S. 250 (1897)..................................................14

*United States v. Trabelsi*,
845 F.3d 1181 (D.C. Cir. 2017)..................................................11

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982)..................................................10

*Williston Basin Interstate Pipeline Co. v. FERC*,
475 F.3d 330 (D.C. Cir. 2006)..................................................16

*In re Wilton Armetale, Inc.*,
968 F.3d 273 (3d Cir. 2020)..................................................9

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*World Wide Mins., Ltd v. Republic of Kazakhstan*,
    296 F.3d 1154 (D.C. Cir. 2002)..............................................................14

**Statutes**

9 U.S.C. §§ 201–208.............................................................................1, 8

9 U.S.C. § 207..................................................................................1, 9, 18

11 U.S.C. § 323.....................................................................................9

**Other Authorities**

New York Convention art. V(1)(b)......................................................2, 18, 21

New York Convention art. V(2)(b)......................................................2, 21, 22

iv

**INTRODUCTION**

The Petition here asks the Court to confirm foreign arbitration awards under terms of the Federal Arbitration Act (FAA) that govern the recognition and enforcement of such awards in the United States, 9 U.S.C. §§ 201–208. The FAA is clear that, as a matter of federal law, a court has subject-matter jurisdiction over such a petition *only* if the petition has in fact been made by a "party to the arbitration." *Id.* § 207. A court lacks subject-matter jurisdiction over a confirmation petition made by any other entity—entities which, moreover, lack Article III standing to obtain confirmation of an award on the arbitration party's behalf.

These straightforward jurisdictional and standing requirements compel dismissal of the petition in this case. Although that petition purports to have been filed on behalf of Doraleh Container Terminal SA ("DCT")—the awardee in the underlying arbitration—DCT did not authorize the petition and is not the entity actually petitioning this Court. The reality is that DCT's one-third, minority owner, DP World Djibouti FZCO ("DP World"), through its own longstanding counsel, has caused the petition to be filed in DCT's name but without DCT's authorization.

Until five years ago, DP World could direct DCT's affairs despite its minority ownership stake. But in mid-2018, amid persistent and intractable disputes between DP World and the Republic—which is DCT's two-thirds majority owner—a Djibouti court appointed a provisional administrator for DCT who has exclusive authority to manage DCT's affairs. Djibouti's courts have repeatedly confirmed that appointment. And DCT's provisional administrator states, in her declaration accompanying this brief, that DCT never authorized the petition. DCT's provisional administrator thus expressly requests, on petitioner DCT's behalf, that the petition be dismissed without prejudice. *See* Second Declaration of Chantal Tadoral ("Tadoral Decl.") ¶ 4.

The jurisdictional requirement that only the "party to the arbitration" may petition the Court to confirm that party's arbitration award cannot be waived. And in any event, the Republic did not waive it. Petitioner's counsel has argued that when the arbitral tribunal issued the relevant awards and elected not to stay its proceedings upon the appointment of DCT's provisional administrator, it necessarily decided who has the proper authority to act on behalf of DCT. But the tribunal expressly declined to answer the authority question. Nor could its decision not to grant a stay application conceivably bear on whether this Court has subject-matter jurisdiction over a petition filed in federal court, or on DP World's lack of standing to pursue the recognition and enforcement of DCT's arbitration awards.

But even if this Court had jurisdiction over the petition, it would fail on its merits under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("New York Convention")—for two independent reasons. *First*, the New York Convention (art. V(1)(b)) precludes confirmation when the "party against whom the award is invoked was not given proper notice . . . of the arbitration proceedings or was otherwise unable to present his case." Here, the tribunal failed to notify the Republic that it had lifted a stay on DCT's counterclaims against the Republic, and thus denied the Republic the opportunity to defend itself against the counterclaims giving rise to the awards that DP World now seeks to confirm on DCT's behalf. *Second*, the New York Convention (art. V(2)(b)) precludes confirmation when recognizing or enforcing "the award would be contrary to the public policy of [the forum] country." Enforcing the awards here would violate United States public policy because they impermissibly interfere with the Republic's ability to control sovereign territory, and because they frustrate the Republic's efforts to further significant sovereign interests.

## BACKGROUND

### A.    The Republic Created DCT to Develop and Operate the Doraleh Container Terminal

The Republic of Djibouti sits along "a strategic shipping location in the Red Sea near the Horn of Africa." Pet. ¶ 11. And the Port of Djibouti is the Republic's economic lifeblood: Its development has brought "increased local employment, infrastructure building, foreign investment," and a "doubling of the country's GDP." Pet. ¶ 14. In the early 2000s, the Republic decided to invest in that crucial economic engine by building a new, modern shipping-container facility called the Doraleh Container Terminal. *See* Pet. ¶ 11. To that end, the Republic created a new entity—Doraleh Container Terminal SA—to spearhead the new terminal's development and operation. *See* Pet. ¶ 1. The Republic established DCT under Djibouti law, which governs DCT's management and operation. *See* Pet. ¶ 11 (DCT "incorporated by a statute passed by Djibouti's Parliament").

Under a joint venture agreement, two-thirds of DCT belonged to a predecessor to Port de Djibouti S.A.—a state-owned enterprise responsible for managing all of Djibouti's ports; and a one-third stake in DCT belonged to DP World—a private company based in Dubai. *See* Pet. ¶ 12. The joint venture agreement gave DP World the right to appoint a majority of DCT's directors, and thereby to control DCT's operation and affairs, notwithstanding its minority stake. *See* Pet. ¶ 1.

The Republic entered into a Concession Agreement with DCT, by which it gave DCT rights to develop, construct, and operate the Terminal in exchange for annual royalties. *See* Pet. ¶ 12. DCT then hired DP World to construct and operate the Terminal. *See* Pet. ¶¶ 12, 14.

### B.    The Republic Commences Arbitration Against DCT and DP World, and the Arbitral Tribunal Stays DCT's and DP World's Counterclaims

In 2014, the Republic, Port de Djibouti S.A., and another governmental entity, the Djibouti Ports and Free Zones Authority, commenced arbitration proceedings against DCT and DP World

in the London Court of International Arbitration. *See* Pet. ¶ 15. The Republic and its co-claimants asserted that the Concession Agreement had emerged from bribery and corruption, and thus sought to rescind it. *Id.*

In August 2014, DP World exercised its operational control over DCT by causing it to execute a power of attorney authorizing three of DP World's attorneys at Quinn Emanuel Urquhart & Sullivan LLP also to represent DCT in "arbitration proceedings under the Arbitration Rules of the London Court of International Arbitration in case n[umber] 142732" and in "any other related matters or legal proceedings." Madden Decl. Ex. A (2014 Power of Attorney), at 1. Accordingly, Quinn Emanuel represented both DP World and DCT during the arbitration proceedings. *See, e.g.*, Madden Decl. Ex. B (Djibouti's Amended Request for Arbitration), ¶ 28 (noting Quinn Emanuel's representation of DP World in DCT-related matters at least as early as April 2014).

DCT and DP World asserted counterclaims against the Republic, and in 2016 the tribunal stayed those counterclaims while the parties explored settlement. *See* Pet. ¶ 17. In 2017, while those counterclaims remained stayed, the tribunal issued two awards dismissing the Republic's claims and ordering it to pay associated costs and fees (which the Republic paid). *See* Pet. ¶ 16.

**C.  DP World and DCT Declined to Renegotiate the Concession Agreement**

In late 2017, the Republic enacted a law authorizing the government to renegotiate its "strategic infrastructure contracts." Pet. ¶ 19. The law also authorized the government to terminate those contracts if renegotiation efforts failed. *See id.* And it required the government to compensate any counterparties to an agreement terminated under the new law. *See id.*

The Republic, invoking its authority under that law, attempted to renegotiate the Concession Agreement with DCT and DP World. *See id.* But DP World and DCT refused. *See id.*

4

As a result, the Republic asserted its right under Djibouti law to terminate the Concession Agreement.[1] *See* Pet. ¶ 20.

### D. The Djibouti District Court Appointed a Provisional Administrator with Exclusive Authority to Direct DCT's Affairs

By late 2018, conflict between DCT's two shareholders—Port de Djibouti S.A. and DP World—had paralyzed DCT. *See* Madden Decl. Ex. C (Djibouti District Ct. Order of Sept. 27, 2018), at 6 (observing the "crisis between the shareholders"). That paralysis included the topsy-turvy circumstance in which DP World, as DCT's minority shareholder, was leveraging its operational control over the joint venture to cause DCT to pursue claims against its own majority owner. *See id.* In an attempt to resolve that conflict, a presidential ordinance (later ratified by enacted law) transferred Port de Djibouti S.A.'s majority interest in DCT to the Republic. *See id.* at 3. As a result, the Republic owns two-thirds of DCT. *See id.* at 4.

The Republic then turned to the Djibouti District Court for a solution. *See id.* It sought an order appointing a provisional administrator for DCT. *See id.* Under Djibouti law, a provisional administrator is a neutral, judicial agent given exclusive authority to direct a company's affairs. *See id.* at 4. Djibouti law allows courts to appoint such a provisional administrator when ownership disputes or governance dysfunction endanger a company's operation. *See id.*

In September 2018, the Djibouti District Court granted the Republic's application and appointed Chantal Tadoral as DCT's provisional administrator. *See id.* at 4–5. The court found that a disagreement between DCT's shareholders—the Republic and DP World—could endanger DCT's operation, and thus that it was "critical to appoint a provisional administrator until the crisis between the shareholders can be resolved." *Id.* at 4. It ordered that Tadoral would "replace the

---

[1] Port de Djibouti S.A. also terminated its joint venture with DP World. *See* Pet. ¶ 2 n.1. That termination is the subject of other, separate arbitration proceedings in London. *See id.*

Board of Directors" and assume authority to exercise "all powers granted to these governing bodies by the law." *Id.* at 4. And it ordered that "her assignment will end on request to or order of the Court" only. *Id.* at 5.

DP World has challenged Ms. Tadoral's appointment in Djibouti's courts. *See infra* pp. 12–13. But to date, the courts at every level have rejected those challenges. *See id.* Each court that has considered the merits has confirmed Tadoral's appointment and her exclusive authority to manage DCT. *See id.*

### E.    Arbitration Proceedings on DCT's and DP World's Counterclaims Resumed Without Notice to the Republic

In late 2017, meanwhile, DP World—through its attorneys at Quinn Emanuel—reported to the tribunal that the parties had not settled the counterclaims, and asked the tribunal to resume proceedings to resolve them. *See* Madden Decl. Ex. D (Third Partial Final Award), ¶ 12. The tribunal agreed to resume arbitration on the counterclaims, but recognized in an email to Quinn Emanuel that "[i]n order to progress matters the tribunal needs to be able to notify the claimants" about the proceedings. *See* Madden Decl. Ex. E (email exchange from June 7, 2017, to Nov. 9, 2018), at 17. It asked Quinn Emanuel to provide "any information about the name and address etc[.] of the representative of the claimants." *Id.* Quinn Emanuel provided contact information only for Mr. Aboubaker Omar Hadi, the chairman of Port de Djibouti S.A. and of the Djibouti Ports and Free Zone Authority—two other arbitration claimants, which were district from the Republic and separately represented. *See id.* at 16.

From then onward, the tribunal sent notice only to Hadi. *See id.* at 1–15. It sent no notice to the Republic. *See id.* As a result, the tribunal failed to notify the Republic that the tribunal had lifted its stay on the counterclaims, that the counterclaimants had filed new written submissions, and that the tribunal had scheduled a November 2018 hearing on the counterclaims. In short, the

resumed proceedings on DP World's and DCT's counterclaims happened without adequate notice to the Republic and without the Republic's participation.

Those proceedings also continued despite Tadoral's request, on behalf of DCT shortly after her appointment, that they be stayed. *See* Madden Decl. Ex. F (Tadoral Ltr. of Dec. 1, 2018), at 2–4. Tadoral explained to the tribunal that DCT's former DP World-appointed "directors no longer have the legal authority to represent DCT and therefore lack standing in the arbitration." *Id.* at 4. She added that, given her exclusive authority to direct DCT's affairs, "Quinn Emanuel cannot claim to be properly instructed to represent DCT in this arbitration." *Id.* at 3.

The tribunal denied Tadoral's stay request. The tribunal reasoned that it "has not been invited to decide on the question of the validity of Mme Tadoral's appointment and it does not do so." Madden Decl. Ex. D, ¶ 21. Because the "arbitration had proceeded, without challenge from the Claimants or Mme Tadoral, to the stage of a hearing of the Respondents' counterclaims," and because "no further participation from either side [wa]s required and that all that remain[ed] [wa]s for the Tribunal to deliver its award," it decided not to stay the proceedings. *Id.*

On March 29, 2019, the tribunal issued its third arbitration award. *See* Pet. ¶ 23. That award declared that the Republic had breached the Concession Agreement, and ordered it to pay approximately $474.4 million in damages, not including interest. *See id.* On July 1, 2019, the tribunal issued its fourth arbitration award, which granted DCT compound interest damages of about $11.3 million for the period ending on April 11, 2019, plus future interest on a certain portion of the underlying award. *See* Pet. ¶ 24.

### F.      DP World's Counsel Filed the Petition in DCT's Name

More than a year later, on September 14, 2020, DP World's attorneys at Quinn Emanuel filed the petition in this Court in DCT's name—implicitly asserting a purported authority to take legal actions on DCT's behalf. The petition seeks an order confirming the third and fourth

7

arbitration awards under the Federal Arbitration Act, *see* 9 U.S.C. §§ 201–208, and a money judgment entered against the Republic in the amount of those awards. Petitioner's counsel at first claimed effective service on the Republic by email under a notice provision of the Concession Agreement (Pet. ¶ 32 & n.4), but the Republic moved to dismiss on the basis of directly contrary authority in this District (Dkt. No. 11). After first opposing the Republic's motion, petitioner eventually changed course and properly served the petition on September 20, 2021. Dkt. No. 24.

Soon after, the Court entered the parties' stipulation that the Republic would answer or otherwise respond to the petition on or before November 22, 2021. Dkt. No. 26. The Republic answered the petition before that stipulated deadline. Dkt. No. 28.

Two weeks later, on December 10, 2021, the Republic served petitioner with limited jurisdictional discovery about only whether DCT had, in fact, authorized the petition as the FAA requires. That discovery took the form of five targeted document requests (Dkt No. 31-2) and five specific interrogatories (Dkt. No. 31-3)—one of which asked simply for the identity of whoever had directed or caused the petition to be filed in DCT's name (*id.* at Interrog. No. 2).

Petitioner's counsel refused to provide that limited jurisdictional discovery absent a court order, and the Republic promptly moved to compel. Dkt. No. 31. As grounds for its jurisdictional discovery requests, the Republic attached to its motion an initial declaration by DCT's provisional administrator, in which she stated that she did not authorize the petition on DCT's behalf, and that Quinn Emanuel is in fact acting as counsel to DP World, not as counsel to DCT. *See* Dkt. No. 31-1, ¶ 6.

The Republic's motion to compel was fully briefed on February 24, 2022. *See* Dkt. Nos. 31, 33, 34. The Court held a hearing on November 14, 2022, denied the Republic's jurisdictional discovery, and ordered the parties to brief the proper resolution of the petition.

8

**ARGUMENT**

I.   **THE COURT SHOULD DISMISS THE PETITION FOR LACK OF JURISDICTION AND STANDING BECAUSE DCT DID NOT AUTHORIZE IT**

A.   **The Court Lacks Jurisdiction Over a Petition Not Actually Made by the "Party to the Arbitration" to Which the Relevant Awards Were Made**

A federal court has subject-matter jurisdiction over a petition to confirm a foreign arbitration award only if the petition is made by a "party to the arbitration" to a "court having jurisdiction." 9 U.S.C. § 207. If "a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the [petition] in its entirety." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Only a court that has jurisdiction over a confirmation petition has the power to "confirm the award," and even then only when "it finds" no "grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention." 9 U.S.C. § 207.

A federal court thus lacks subject-matter jurisdiction over a confirmation petition that the arbitral party that obtained the award did not actually authorize. The FAA's statutory requirement that courts may hear and decide only confirmation petitions made by the "party to the arbitration" precludes courts from adjudicating confirmation petitions that are, in fact, made by someone else.

In this respect, the FAA operates like any number of federal statutes that specify the entities entitled to pursue a cause of action, to the exclusion of all other entities, who may not invoke the court's jurisdiction. For example, the Bankruptcy Code confers only on the trustee of a debtor's estate the "capacity to sue" on the estate's behalf. 11 U.S.C. § 323. A court cannot hear a cause of action that anyone other than the estate's trustee seeks to pursue in the estate's name (absent certain bankruptcy-specific exceptions to that rule). *See In re Wilton Armetale, Inc.*, 968 F.3d 273, 280 (3d Cir. 2020) ("[T]he Bankruptcy Code gives the trustee, and only the trustee, the statutory authority" to file complaints on behalf of the estate.). This jurisdictional prerequisite—that the trustee is exercising its statutory authority to sue—must be satisfied before a court may proceed to

9

consider any substantive defenses to the estate's lawsuit—defenses that come into play only if the court has jurisdiction in the first place.

Moreover, were the Court to entertain a confirmation petition filed by someone other than the arbitration awardee, it would exceed its limited constitutional authority to decide only "actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976)). Adjudicating a confirmation petition filed assertedly on one party's behalf, but in fact filed at some other entity's behest, would upend the "bedrock requirement" that federal courts decide only matters presenting a "real, earnest and vital controversy" between the actual parties in interest. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982) (quoting *Chicago & Grand Trunk Ry. v. Wellman*, 143 U.S. 339, 345 (1892)).

Nor can these matters of jurisdiction and standing be resolved just by reading the party names as they appear in the petition's caption. Rather, when disputes arise about whether a named party authorized a pleading filed in its name, a court must look beyond the caption to assure itself that it in fact has jurisdiction. As early as *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738 (1824), the Supreme Court recognized that "no man has a right to appear as the attorney of another, without the authority of that other," *id.* at 829. Rather, an attorney always must actually "receive the authority of the corporation to enable him to represent it." *Id.* Although producing evidence of an attorney's authority is not "a necessary preliminary" to appearing on a corporation's behalf in every case, the Supreme Court emphasized nearly two centuries ago that the attorney's "power" of "representing another in Court, and prosecuting or defending a suit in his name," always "must indeed exist." *Id.* at 830–31.

10

Applying this principle, other courts have concluded that when there is "substantial proof in the form of countervailing evidence that authority is lacking" for an attorney to act on a named party's behalf, then it is appropriate to "require an attorney . . . to show his authority to appear" for that party. *Booth v. Fletcher*, 101 F.2d 676, 683 (D.C. Cir. 1938); *see also Dep't of Water & Power of City of Los Angeles v. Anderson*, 95 F.2d 577, 580 (9th Cir. 1938) (presumption of attorney authority to act for party gives way when "proof is submitted challenging the truth of such assumption, sufficient to warrant inquiry regarding such authority").

### B.    DCT Did Not Authorize the Petition

The Republic established DCT under Djibouti law, and so Djibouti law governs who may authorize actions on DCT's behalf. *See City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009) (applying English law to corporate-governance matter involving English corporation); *see also United States v. Trabelsi*, 845 F.3d 1181, 1192 (D.C. Cir. 2017) ("U.S. courts will defer to the judgment of foreign courts construing their own laws."). Under the "internal affairs doctrine," courts generally "apply the law of the state of incorporation" to evaluate "matters of corporate governance or other internal affairs of a company." *Harper Woods*, 589 F.3d at 1298 (citing *Cowin v. Bresler*, 741 F.2d 410, 414 n.4 (D.C. Cir. 1984); *Labovitz v. Wash. Times Corp.*, 900 F. Supp. 500, 503 (D.D.C. 1995)). This "internal affairs doctrine applies to corporations incorporated outside of the United States." *Id.*

Under Djibouti law, courts can appoint independent, judicial agents—called provisional administrators—to direct a company's affairs when ownership disputes or other corporate-governance dysfunctions endanger its operation. *See* Madden Decl. Ex. C, at 6; Tadoral Decl. ¶ 4. By late 2018, such a conflict had arisen between DCT's majority and minority shareholders—the Republic and DP World, respectively. *See* Madden Decl. Ex. C, at 6; Tadoral Decl. ¶ 3. Among other challenges, the Republic and DP World disagreed about the wisdom of

11

DCT pursing and enforcing arbitration awards against its own majority owner (which would be entitled to the lion's share of anything that DCT recovered from it). *See* Madden Decl. Ex. C, at 4–6 (explaining the Republic's position that DP World seeks to "monopolize the powers in DCT and to abuse those powers in [DP World's] own interest, at the expense of [DCT's] corporate interest"). But DP World, despite its minority stake in the enterprise, was exercising its control of DCT's board to paralyze DCT's operations and decision-making on this and other issues. *See id.* at 5–6 (noting how DP World-appointed directors had acted "against the State of Djibouti, majority shareholder" of DCT). The Republic, in its capacity as DCT's majority shareholder, applied to the Djibouti District Court for appointment of a provisional administrator who could independently manage DCT through its governance crisis. *See id.* at 4.

The Djibouti District Court granted the Republic's application in September 2018, and appointed Chantal Tadoral as DCT's provisional administrator. *See id.* at 5–6. The court held that DCT's situation met the legal criteria for making such an appointment under Djibouti law. *See id.* at 5–7. It found that the ongoing disagreement between DCT's two owners, the Republic and DP World, endangered DCT's operation, such that it was "critical to appoint a provisional administrator until the crisis between the shareholders can be resolved." *Id.* at 6. The court ordered Tadoral to "replace [DCT's] Board of Directors until the crisis is resolved," and authorized her to exercise all "the powers that the law grants to governing bodies." *Id.* at 7.

DP World, represented by Quinn Emanuel, has repeatedly challenged Tadoral's appointment in Djibouti's courts, but invariably without success. Tadoral Decl. ¶ 4–5. In its first series of challenges, DCT's former chairman, a DP World appointee, asked the Djibouti District Court reconsider its order appointing Tadoral. *See* Madden Decl. Ex. G (Djibouti District Ct. Order of Nov. 15, 2018), at 2; Tadoral Decl. ¶ 5. The court rejected that challenge on its merits and

12

confirmed the appointment. *See* Madden Decl. Ex. G, at 7; Tadoral Decl. ¶ 5. DP World appealed to the Djibouti Court of Appeals, which affirmed. *See* Madden Decl. Ex. H (Djibouti Ct. of Appeals Decision of Jan. 3, 2019), at 4; Tadoral Decl. ¶ 5. DP World appealed again, this time to the Djibouti Supreme Court, which dismissed that appeal and denied a reconsideration request. *See* Tadoral Decl. ¶ 5. Accordingly, by the time that Quinn Emanuel filed the petition in this Court in DCT's name, three levels of Djibouti's courts had fully and finally decided that Tadoral—not DP World—had the exclusive authority to direct legal actions taken in DCT's name. *See id.*

More recently, after the petition was filed here, DP World launched a renewed attack on Tadoral's authority in Djibouti's courts. *See id.* ¶ 6. In 2021, DP World (again represented by Quinn Emanuel) applied to the Djibouti District Court to rescind Tadoral's appointment. *See id.* That application largely relied on the same arguments that DP World and Quinn Emanuel— through DCT's former chairman—had pressed before. *See id.* The Djibouti District Court rejected DP World's renewed challenge. *See id.* DP World's appeal from that decision is pending, but that pending appeal does not affect Tadoral's existing (and repeatedly confirmed) authority to direct and manage DCT's affairs under Djibouti law.[2] *See id.*

Accordingly, Tadoral has been DCT's duly authorized, court-appointed, provisional administrator since September 2018—two years before the petition was filed in DCT's name in this Court. In her declaration accompanying this brief, Tadoral states that she never authorized that

---

[2] If, however, the Court concludes that the outcome of DP World's pending appeal bears on its exercise of jurisdiction over the petition, then it could stay these proceedings pending the final determination on that appeal in Djibouti's courts. *See, e.g.*, *CC/Devas (Mauritius) Ltd. v. Republic of India*, No. 1:21-cv-106-RCL, 2022 WL 873620, at *4–5 (Mar. 24, 2022) (staying petition to confirm arbitration award pending foreign judicial proceedings, without first resolving whether the court has jurisdiction over the petition). It cannot, however, accept petitioner's counsel's invitation to declare, based only on the pending appeal, that Djibouti courts have made "no conclusive determination," and thereby exercise jurisdiction to decide the petition on the merits. Nov. 14, 2022 Hr'g Tr. 16:10.

petition on behalf of DCT. *See id.* ¶ 7. More specifically, she "did not authorize Quinn Emanuel—or any other firm—to file the petition or to advise or represent DCT in these proceedings." *Id.* Tadoral also disputes—and, in any event, expressly revokes—any residual power to act for DCT that DP World's counsel might be asserting based on authority conferred many years ago by DP World's appointees to DCT's prior board of directors, whose authority over DCT was supplanted by Tadoral's appointment. *See id.* ¶ 8. Tadoral, acting on DCT's behalf, thus asks the Court to dismiss without prejudice the petition ostensibly filed by DCT. *See id.* ¶ 9–10.

Petitioner's counsel's attempts to evade Tadoral's legal authority over DCT are far off target. *First*, counsel impugns—without evidence—Tadoral's "motives" for objecting to a legal action having been filed on DCT's behalf without her authorization. Counsel has suggested that because Tadoral was appointed upon the Republic's application, she was "put in by Djibouti" and has "a conflict of interest," resulting in a supposedly "self-serving declaration." Nov. 14, 2022 Hr'g Tr. 17:9–11, 23:8.

These attacks on Tadoral's motives are baseless. Tadoral was not "put in by Djibouti," except insofar as the Republic, acting as DCT's majority owner, exercised its legal right under Djibouti law to seek judicial appointment of an independent arbiter to resolve its ongoing corporate-governance disputes with DCT's minority owner. Courts from Djibouti's independent judiciary appointed Tadoral, and then confirmed that appointment several times over.[3] Nor can

---

[3] Even if the facts were otherwise—and they are not—they concern the internal affairs and governance of a foreign entity, a matter in which federal "courts will not ordinarily interfere." *Bellevue Gardens, Inc. v. Hill*, 297 F.2d 185, 187 (D.C. Cir. 1961). Moreover, the "act of state doctrine 'precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.'" *World Wide Mins., Ltd v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)). Courts in this "'country will not sit in judgment' of those acts when done within the territory of the foreign state." *Samantar v. Yousuf*, 560 U.S. 305, 322 (2010) (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)).

14

petitioner's counsel support its implausible charge that Tadoral's declaration is "self-serving." Tadoral made her declarations here solely in her "capacity as provisional administrator of DCT and on DCT's behalf," with no conceivable personal benefit. Indeed, her declarations are expressly *DCT*-serving. In other words, they serve the entity that petitioner's counsel supposedly represents. The fact that counsel purporting to appear for DCT have attacked a declaration by DCT's own provisional administrator demonstrates well enough that an entity other than the named petitioner is really pulling the strings in this action.

*Second*, counsel's attempt to rely on a 2014 power of attorney as providing it authority to file the 2020 petition on DCT's behalf is unavailing for two main reasons. For starters, the power of authority was always limited to the arbitration and its related matters and proceedings. *See* Madden Decl. Ex. A, at 1. The examples of related matters and proceedings provided by the power of attorney mostly involve actions that might be taken in support of the arbitration itself—things like "nominating or appointing arbitrators," "agreeing [on] procedural timetabling matters," and "corresponding with any arbitral tribunal and any solicitors representing the Claimants." *Id.* No example comes anywhere near instituting an entirely new legal proceeding in another country's courts more than a year after the arbitration.[4] In any event, under Djibouti law, the 2014 power of attorney lost all force when Tadoral replaced the board of directors that had granted it. Tadoral Decl. ¶ 8. And even if that were not clear enough, Tadoral has expressly "revoke[d]" the power of attorney on DCT's behalf. *Id.*[5]

---

[4] Moreover, the 2014 power of attorney is limited to three specified Quinn Emanuel attorneys or their delegees. Neither of the surviving named attorneys signed the petition, and petitioner refused to produce, in response to respondent's discovery requests, any record of a delegation of authority to the attorneys who signed the petition.

[5] At the November 2022 discovery hearing, petitioner's counsel alluded to 2016 "board resolutions" that supposedly "reaffirmed" DCT's 2014 retention of Quinn Emanuel at DP World's behest. Nov. 14, 2022 Hr'g Tr. 16:13, 14:25. No such resolutions accompany the petition or

In sum, only Tadoral could have validly authorized the petition to be filed in DCT's name. She did not do so. Rather, she has asked, on DCT's behalf, "that this proceeding be dismissed without prejudice as having been filed and prosecuted in DCT's name without authority." *Id.* ¶ 9.[6]

### C.      The Court's Lack of Jurisdiction Cannot Be Waived and Was Not Waived

Petitioner has asserted that the Republic forfeited or waived any challenge to this Court's subject-matter jurisdiction by actions that it took, or failed to take, during the arbitration proceedings. For at least three reasons, these arguments have no merit.

First, because the assertion that a federal court lacks subject-matter jurisdiction "involves the court's power to hear a case," it "can never be forfeited or waived." *Williston Basin Interstate Pipeline Co. v. FERC*, 475 F.3d 330, 336 (D.C. Cir. 2006) (quoting *Arbaugh*, 546 U.S. at 514). Indeed, federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists," even if no party raises the issue. *In re Nat'l Nurses United*, 47 F.4th 746, 755 (D.C. Cir. 2022) (quoting *Arbaugh*, 546 U.S. at 514). No matter what happened during the arbitration proceedings, nothing about them could have waived or forfeited the Republic's right to assert that this Court lacks subject-matter jurisdiction over a petition that DCT never authorized (or this Court's independent obligation to assure its jurisdiction over the petition).

---

otherwise appear in the existing record. And petitioner has refused to produce any such documents in response to respondent's jurisdictional discovery requests. But any such 2016 reaffirmation of the 2014 power of attorney could not have survived Tadoral's appointment, and in any case has expressly been revoked by Tadoral's declarations to this Court.

[6] If the Court were to conclude that the record is underdeveloped on petitioner's counsel's authority to file the petition in DCT's name, then the Republic requests that the Court reconsider its decision to deny the Republic the limited jurisdictional discovery that it sought from petitioner. Nor should the Court permit petitioner to expand the record with self-selected information and material in connection with its reply brief. Petitioner refused, for more than a year, to provide respondent even a single interrogatory response with basic factual information concerning the authority under which the petition was filed on DCT's behalf.

16

Next, this confirmation proceeding is distinct from the underlying arbitration. It involves different laws, in a different jurisdiction, before a different tribunal, based in part on different facts that post-date the arbitral proceedings. So any late-2018 arbitral decision relating to Tadoral's authority to direct DCT's affairs has nothing to do with whether—years later in a federal district court—DP World can usurp Tadoral's authority over DCT by causing its own attorneys to file a petition in DCT's name.

Finally, and in any event, nothing about the arbitration proceeding that concluded in London in mid-2019 could control whether DCT authorized the petition filed in its name in a United States federal court in September 2020. The only relevant arbitration event was Tadoral's request, on DCT's behalf shortly after her appointment as its provisional administrator, to stay the arbitration proceedings on DCT's and DP World's counterclaims. The tribunal denied Tadoral's stay request, but only because the tribunal had already held the necessary hearing, "no further participation from either side [wa]s required," and "all that remain[ed] [wa]s for the Tribunal to deliver its award." Madden Decl. Ex. D, ¶ 21. In reaching that circumscribed decision on Tadoral's stay request, the tribunal emphasized that it had "not been invited to decide on the question of the validity of Mme Tadoral's appointment *and it does not do so*." *Id.* (emphasis added). In short, the tribunal concluded that it could deliver its awards no matter who had proper authority over DCT, and so it proceeded on that basis. [7] *Id.*

---

[7] As explained below, the arbitral tribunal never notified the Republic about its resumed counterclaim proceedings, and so the Republic was not afforded the opportunity to participate in them—including the tribunal's consideration of Tadoral's stay request. *See infra* § II.B. That is a yet another reason the Republic could not have waived or forfeited a subject-matter jurisdiction in this court during a proceeding in which it did not participate and about which it received no notice.

17

## II.    THE COURT SHOULD DENY THE PETITION UNDER THE NEW YORK CONVENTION IF IT CONCLUDES THAT IT HAS JURISDICTION

If this Court concludes that it has jurisdiction over the petition, then it should deny the petition on its merits. The FAA precludes enforcing an arbitral award if "one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention" applies. 9 U.S.C. § 207. Two independent grounds for refusal under the New York Convention apply here: First, the Republic was denied due process through inadequate notice of arbitration proceedings on the counterclaims asserted against it. Second, recognizing or enforcing arbitral awards that effectively impose private control over part of a sovereign nation's principal seaport would be contrary to public policy.

### A.    The Republic Received Inadequate Notice During the Arbitration and Could Not Defend Against the Counterclaims That Produced the Awards

One ground for a court to refuse to recognize and enforce an arbitral award under the New York Convention is that the "party against whom the award is invoked was not given proper notice . . . of the arbitration proceedings or was otherwise unable to present his case." N.Y. Convention art. V(1)(b). That defense to enforcement "essentially sanctions the application of the forum state's standards of due process." *Belize Bank Ltd. v. Gov't of Belize*, 191 F. Supp. 3d 26, 38–39 (D.D.C. 2016), *aff'd*, 852 F.3d 1107 (D.C. Cir. 2017) (quoting *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (Rakta)*, 508 F.2d 969, 975 (2d Cir. 1974)).

The tribunal violated those due process standards when it lifted the stay of its proceedings on the counterclaims against the Republic without notifying the Republic of those resumed proceedings. In 2016, the tribunal stayed DCT's and DP World's counterclaims against the Republic while the parties pursued settlement talks. *See* Pet. ¶ 17. In December 2017, the Republic's arbitration counsel at Gibson Dunn & Crutcher informed the arbitrators that Gibson

18

Dunn no longer represented the Republic in the arbitration. Madden Decl. Ex. E, at 19–20 (explaining that Gibson Dunn is "no longer instructed to act for the Respondent in this matter"). After Quinn Emanuel, on DP World's behalf, reported to the tribunal that the parties had not settled the counterclaims, and asked the tribunal to resume its proceedings on them, the arbitrators responded that "the tribunal needs to be able to notify the claimants (who are no longer represented by Gibson Dunn) of any procedural matters." *Id.* at 17. The tribunal thus asked Quinn Emanuel to supply it with information for a replacement representative of the Republic to receive such notice. *Id.*

Quinn Emanuel responded with contact information for Mr. Aboubaker Omar Hadi, the chairman of Port de Djibouti S.A. and of the Djibouti Ports and Free Zone Authority—two other arbitration claimants, distinct from the Republic, and separately represented during the proceedings. *See id.* at 15–16. From then onward, the tribunal sent notice only to Hadi, as through doing so qualified as serving notice on the Republic. *See id.* at 2–17. The tribunal never considered—let alone explained—how serving one claimant's representative provided effective service on a different claimant. *See id.* It simply presumed, based solely on the representation of an opposing party's counsel, that such service would be sufficient. *See id.*

But notifying Hadi did *not* give the Republic adequate notice of the counterclaim proceedings. The 1998 London Court of International Arbitration (LCIA) Rules that governed the arbitration provide that a "party may be represented in the arbitration by legal practitioners or any other representatives." Madden Decl. Ex. I, at 8 (LCIA Rule 18.1 (1998)). Until they withdrew from the arbitration, attorneys from Gibson Dunn represented the Republic. Hadi separately represented Port de Djibouti S.A. and the Djibouti Ports and Free Zone Authority only, and the Republic never authorized him also to represent it before the tribunal.

19

True, Hadi had represented the Republic in connection with the Concession Agreement. But representing the Republic in that context did not authorize him to serve as the Republic's authorized representative before the arbitral tribunal. Indeed, the Concession Agreement's notice provision applied only to "notices to be given under this Agreement," and not to arbitration-related notices. Madden Decl. Ex. J (Concession Agreement § 22.5), at 2. Such language "is specifically circumscribed to communications" that are themselves provided for "under the agreement" itself. *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 225 F. Supp. 3d 18, 23 (D.D.C. 2014).

The tribunal's failure to notify the Republic of its resumed proceedings on the counterclaims also violated several other rules governing the proceeding. LCIA Rules require that "any party" who "sends to the [Arbitral Tribunal] any communication" must "include a copy for each arbitrator," "send copies direct to all other parties," and "confirm to the [Arbitral Tribunal] in writing that it has done or is doing so." Madden Decl. Ex. I, at 6 (LCIA Rule 13.3 (1998)). The rules also require the tribunal to "give to the parties reasonable notice" of the "date, time and physical place of any meetings and hearings in the arbitration." *Id.* at 8 (LCIA Rule 19.3 (1998)). By notifying Hadi only, and not notifying any authorized representative of the Republic, the tribunal failed to satisfy these notice requirements.

The tribunal's failures deprived the Republic of due process's fundamental guarantees: fair notice and an opportunity to be heard. "Due process is afforded only by the kinds of 'notice' and 'hearing' that are aimed at establishing the validity, or at least the probable validity, of the underlying claim." *Fuentes v. Shevin*, 407 U.S. 67, 97 (1972) (internal quotation marks omitted) (alterations adopted). And these guarantees reinforce each another: without adequate notice, there can be no opportunity to be heard. In the arbitration proceedings, the Republic enjoyed neither.

The Republic lacked fair notice that the tribunal had lifted its stay on the counterclaims, that counterclaimants had filed written submissions, and that the tribunal had scheduled a hearing. And so the Republic was not heard in defense against those counterclaims. It was excluded from correspondence between DP World's lawyers and the tribunal. It had no opportunity to make written submissions regarding the counterclaims. And it was unrepresented at the November 2018 hearing on those counterclaims—an entirely one-sided affair in which only DCT and DP World were represented and participated. *See* Madden Decl. Ex. D, ¶ 17.

In those circumstances, the Republic's lack of participation in the restarted counterclaim proceedings was neither knowing nor voluntary. *See Fuentes*, 407 U.S. at 94–95 (requiring "waiver of due process rights" to be "'voluntarily, intelligently, and knowingly' made") (quoting *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 187 (1972)). Courts "do not presume acquiescence in the loss of fundamental rights." *Id.* at 94 n.31. (quoting *Ohio Bell Tel. Co. v. Pub. Utilities Comm'n of Ohio*, 301 U.S. 292, 307 (1937)). "Indeed, in the civil no less than the criminal area, 'courts indulge every reasonable presumption against waiver.'" *Id.* (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937)). Because the Republic failed to receive adequate notice about proceedings on the counterclaims against it, and was prevented from defending itself against them, the Court should deny the petition under Article V(1)(b) of the New York Convention.

### B.      Enforcing the Awards Would Be Contrary to United States Public Policy

A separate and independent ground for refusing to recognize and enforce an arbitration award under the New York Convention is when doing so "would be contrary to the public policy of [the forum] country." N.Y. Convention art. V(2)(b). That defense applies here. The arbitration awards here interfere with the Republic's ability to control the Port—its sovereign territory. The awards thus frustrate multiple of the Republic's sovereign interests, including the right to control its borders, to protect its citizens' health and safety, to protect natural features unique to the Port

21

of Djibouti, and to safeguard the Port's economic significance. Confirming such awards would violate United States public policy. And so the Court should deny the petition under Article V(2)(b) of the Convention.

At least one court in this District has declined to recognize and enforce an arbitration award in analogous circumstances. In that case, the court recognized that "forced interference" with a foreign country's "complete control over its territory violates public policy to the extent necessary to overcome the United States' policy preference for the speedy confirmation of arbitral awards." *Hardy Expl. & Prod. (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Gas*, 314 F. Supp. 3d 95, 113 (D.D.C. 2018). So too here.

## CONCLUSION

The Court should dismiss the petition for lack of jurisdiction and standing. In the alternative, it should deny recognition and enforcement of the awards under the New York Convention.

Dated: January 3, 2023            Respectfully submitted,

KRAMER LEVIN NAFTALIS &
    FRANKEL LLP

/s/ Matthew M. Madden
Matthew M. Madden (D.C. Bar No. 991139)
Jason A. Shaffer ( D.C. Bar No. 888314607)
2000 K Street N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
mmadden@kramerlevin.com

*Counsel for Respondent the Republic of Djibouti*

22

## <u>CERTIFICATE OF SERVICE</u>

On this 3rd day of January, 2023, I directed this document to be electronically filed with the Clerk of the Court for the United States District of Columbia by using the Court's CM/ECF system, which will send notification of this filing to all counsel of record.

Respectfully submitted,

/s/ Matthew M. Madden
Matthew M. Madden (D.C. Bar No. 991139)
KRAMER LEVIN NAFTALIS &
    FRANKEL LLP
2000 K Street N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
mmadden@kramerlevin.com

*Counsel for Respondent the Republic of Djibouti*

23