# EXHIBIT B

**LONDON COURT OF INTERNATIONAL ARBITRATION**

LCIA Case No. 142732

**REPUBLIC OF DJIBOUTI**
**DJIBOUTI PORTS AND FREE ZONE AUTHORITY**
**PORT DE DJIBOUTI S.A.**

<u>Claimants</u>

-and-

**DP WORLD DJIBOUTI FZCO**
**DUBAI (INTERNATIONAL) DJIBOUTI FZE**
**DORALEH CONTAINER TERMINAL SA (nominally)**

<u>Respondents</u>

---

**AMENDED REQUEST FOR ARBITRATION**

---

**7 August 2014**

**GIBSON, DUNN & CRUTCHER LLP**

—

Telephone House
2-4 Temple Avenue
London
EC4Y 0HB

Ex. B - Page 1

A.    **INTRODUCTION**

1.    This Amended Request for Arbitration ("Request") is submitted on behalf of the Claimants pursuant to Article 1.1 of the LCIA Rules of Arbitration (the "LCIA Rules"). Copies of this Request and all accompanying documents are being served simultaneously on the Respondents by hand delivery at their registered addresses. Two copies of this Request have been submitted to the Registrar pursuant to Article 1.2 of the LCIA Rules.

2.    The Claimants, the Republic of Djibouti, inclusive of its agencies or instrumentalities Djibouti Ports and Free Zone Authority ("DPFZA") and Port de Djibouti S.A. (formerly known as Port Autonome Internationale de Djibouti) ("PAID"), are parties to a Concession Agreement dated 31 October 2006 (the "Concession Agreement") with Respondents Doraleh Container Terminals S.A. ("DCT") and DP World Djibouti FZCO ("DP World").[1] DCT is in turn a joint venture between Claimant PAID and Respondent DP World.[2] Pursuant to the Joint Venture Agreement, and despite PAID's majority ownership interest, DP World has absolute control over the DCT Board and management and, therefore, DCT.

3.    The Concession Agreement grants DCT the exclusive right, for 30 years (plus two further 10-year options), to develop, construct, manage and operate the Doraleh Container Terminal in Djibouti. The Doraleh Container Terminal is a significant State asset. It is located on one of the world's busiest shipping routes and is regarded as the most technologically advanced container terminal in the African continent.

4.    As directed by Respondent DP World, pursuant to the Concession Agreement, DCT, among other things, entered into a Management Services Agreement dated 6 December

---

[1]  A copy of the Concession Agreement is annexed hereto as Claimants' Exhibit 1 ("C1"). The original Concession Agreement named Respondent Dubai International (Djibouti) FZE ("DID") as "confirming party". That was later changed to DP World upon execution of a 22 May 2007 addendum to the Concession Agreement. A copy of the Addendum is annexed hereto as Claimants' Exhibit 11 ("C11").

[2]  A copy of the Joint Venture Agreement is annexed hereto as Claimants' Exhibit 2 ("C2").

1

2007 which granted to DP World the *"exclusive and over-all control over and with day to day responsibility for the management and the operation of the Terminal on behalf of [DCT] . . . ."*[3]   DP World is handsomely compensated for rendering its management services.

5.   This is a simple case.   The government official charged with responsibility for negotiating the Concession Agreement (and related Agreements) on Djibouti's behalf was Abdourahman Boreh.   Mr Boreh was, from 2003 to November 2008, the Chairman of Claimant DPFZA, the statutory authority with power to regulate all activity within the Djibouti Free Zone – in which DCT operates.   During the same period, he also signed certain agreements on behalf of Claimant PAID, the ports authority with jurisdiction over Djibouti's ports, as "Chairman of the Board".

6.   In the course of litigation proceedings the Claimants have commenced against Mr Boreh for misuse of his official government position, tax evasion and other wrongdoing, Claimants have discovered that Respondent DP World and/or its officials paid significant bribes to Mr Boreh, and wrongfully conferred other benefits on him, during the time period when the Concession and related project agreements were being negotiated and signed.   The bribes were paid covertly through the use of vague "consultancy agreements", offshore companies and overseas bank accounts.   Other financial incentives were also given through the award of substantial contracts to Mr Boreh's companies and a concealed agreement to transfer shares in DP World to an offshore company owned by Boreh.

7.   Under English law, this corruption renders the Concession and related agreements voidable by the Claimants and subject to rescission.

8.   Claimants have exercised their right to avoid and rescind the Concession Agreement, Joint Venture Agreement and Management Services Agreement.   Claimants seek a declaration that they are entitled to rescind the Concession and Joint Venture

---

3   A copy of the Management Services Agreement is annexed hereto as Claimants' Exhibit 3 ("C3").

2

Agreements, together with damages.[4]  Pending receipt of the requested declaration, Claimants have agreed for the *status quo* to be maintained provided this case proceeds expeditiously.

## B.  THE PARTIES

### Claimants

9.  Claimant Republic of Djibouti is a sovereign State.  As noted, Claimant DPFZA is the statutory authority with power to regulate all activity within the Djibouti Free Zone while Claimant PAID is the authority with jurisdiction over Djibouti's ports.

10.  All notifications and communications for the attention of the Claimants regarding this dispute should be sent to:

Cyrus Benson
Gibson Dunn & Crutcher LLP
Telephone House
2-4 Temple Avenue
London EC4Y 0HB
UK
Tel:    +44 20 7071 4000
Fax:    + 44 20 7071 4244
Email: cbenson@gibsondunn.com

### Respondents

11.  Respondent DP World Djibouti FZCO is incorporated under the laws of the United Arab Emirates and is registered in the Jebel Ali Free Zone.  On information and belief, the exclusive business of DP World is its participation with the Claimants in the joint venture for the construction, operation and management of the Doraleh Container Terminal.

---

[4]  Respondent DP World has objected to having the validity of Claimants' rescission of the Management Services Agreement determined in this proceeding.  In order to avoid unnecessary delay and expense, and because the Management Services Agreement will stand or fall with the Concession and Joint Venture Agreements, Claimants have acquiesced in this objection.

3

12.    DP World is a subsidiary of DP World Ltd, a company listed on the London Stock Exchange (DPW:LSE) and the NASDAQ Dubai (DPW:Nasdaq Dubai).  DP World Ltd is a major, partially UAE State-owned company based in Dubai.  It is one of the largest marine terminal operators in the world, with a portfolio of more than 65 marine terminals across six continents served by approximately 30,000 employees.

13.    DP World's registered office is:

> PO Box 17000
> Jebel Ali Free Zone
> Dubai
> United Arab Emirates

14.    On information and belief, Respondent DID is either a former incarnation of Respondent DP World or one of a family of wholly-owned and controlled shell companies of DP World.  If the latter, DID was used by DP World as the "confirming party" to the Concession Agreement until replaced by DP World upon execution of the May 2007 Addendum.

15.    Respondent DCT is the joint venture company owned by Claimant PAID and Respondent DP World.  It is the Concessionaire under the Concession Agreement and is named as a nominal respondent for purposes of ensuring complete relief.  DCT's registered office is:

> Doraleh Container Terminal S.A.
> BP 2017, Djibouti
> Republic of Djibouti

## C.    PROCEDURAL MATTERS

### 1.    The Arbitration Agreements

*The Concession Agreement*

16.    Article 20 of the Concession Agreement provides as follows:

*"ARTICLE 20*
*DISPUTE RESOLUTION*

*20.1    Amicable Settlement*

4

*If any dispute or difference or claims of any kind arises between the Grantor and the Concessionaire in connection with construction, interpretation or application of any terms and conditions or any matter or thing in any way connected with or in connection with or arising out of this Agreement, or the rights, duties or liabilities of any Party under this Agreement, whether during the Term or on expiry thereof, whether before or after the termination of this Agreement, then the Parties shall meet together promptly, at the request of any Party, in an effort to resolve such dispute, difference or claim by discussion between them.*

20.2   *Arbitration*

20.2.1   *Arbitrators*

*Failing amicable settlement and/or settlement the dispute or differences or claims, as the case may be, shall be finally settled by binding Arbitration under the Rules of Arbitration of the London Centre for International Arbitration by a sole arbitrator appointed in accordance with the said Rules.*

20.2.2   *Place of Arbitration and Governing Procedure*

*The place of Arbitration shall be London, United Kingdom and the procedure for such arbitration shall be governed by the Rules of the International Chamber of Commerce ("ICC Rules")[5].*

20.2.3   *English Language*

*The request for Arbitration, the answer to the request, the terms of reference, any written submissions, any orders and rulings shall be in English and, if oral hearings take place, English shall be the language to be used in the hearings.*

20.2.4   *Enforcement of Award*

*Any decision or award resulting from Arbitration shall be final and binding upon the Parties. The Parties hereto, hereby waive, to the extent permitted by law, any rights to appeal or to review of such Award by any court or tribunal. The Parties hereto, agree that the Arbitral Award may be enforced against the Parties to the Arbitration proceeding or their assets, wherever they may be found, and that a judgement upon the Arbitral Award may be entered in any court having jurisdiction thereof.*

---

[5]   The reference to the ICC Rules is a clear error.

5

*20.2.5  Fees and Expenses*

*The fees and expenses of the Arbitrators and all other expenses of the Arbitration shall be initially borne and paid by respective Parties, subject to determination by the Arbitrators. The Arbitrators may provide in the Arbitral Award for the reimbursement to the prevailing party of its costs and expenses in bringing or defending the Arbitration claim, including legal fees and expenses incurred by such Party."*

*The Joint Venture Agreement*

17.  Article 20 of the Joint Venture Agreement provides as follows:

"*20.    DISPUTES*

20.1  *In the event of any dispute between the Shareholders arising out of or relating to this Agreement, representatives of the Shareholders shall, within 10 Business Days of service of a written notice from any Shareholder to the others (a "Disputes Notice"), hold a meeting (a "Dispute Meeting") in an effort to resolve the dispute.  In the absence of agreement to the contrary the Dispute Meeting shall be held at the registered office for the time being of the Company.*

20.2  *Each party shall use all reasonable endeavours to send their respective Chief Executive Officers, having the authority to settle the dispute to attend the Dispute Meeting.*

20.3  *Any dispute which is not resolved within 20 Business Days after the service of a Disputes Notice, whether or not a Dispute Meeting has been held, shall, at the request of either party made within 20 Business Days of the Disputes Notice being served, be referred to arbitration under the rules of London Court of International Arbitration (the "Rules") before a single arbitrator who shall be appointed in accordance with the Rules. The place of the arbitration shall be London, England although hearings may be held elsewhere and the language of the arbitration shall be English. The parties waive any right of application or appeal to any court, insofar as such waiver can validly be made.*"

2.    The Validity of the Concession and Joint Venture Agreements May be Addressed in a Single Arbitration

18.  As described further below, the Concession Agreement, Joint Venture Agreement and Management Services Agreement represent part of an integrated transaction between the same parties.  The Concession Agreement is between Claimants Republic of Djibouti,

6

DPFZA and PAID on the one hand, and Respondents DCT and DP World (originally through Respondent DID) on the other. The Joint Venture Agreement is between Claimant PAID and Respondents DP World and DCT, and the Management Services Agreement is between Respondents DCT and DP World. Each of the Agreements provides for LCIA Arbitration in London before a sole arbitrator to be appointed according to the LCIA Rules.

19.     In these circumstances, Claimants submit that the validity of the Concession, Joint Venture and Management Services Agreements may be assessed and determined in a single arbitration proceeding.

20.     Respondent DP World has challenged this position with respect to the Management Services Agreement. In order to avoid unnecessary delay and expense, Claimants have agreed that this Arbitration shall proceed only with respect to claims asserted under the Concession and Joint Venture Agreements. The rescission of the Concession and Joint Venture Agreements will estop Respondents from contesting Claimants' rescission of the Management Services Agreement. That agreement will in any event fail and/or become meaningless in circumstances where DCT is no longer a Concessionaire and has no continuing rights with respect to the operation of the Doraleh Container Terminal.

   3.     Appointment of the Arbitral Tribunal

21.     Pursuant to Article 20.2.1 of the Concession Agreement, any dispute submitted to arbitration is to be decided by a sole arbitrator appointed in accordance with the LCIA Rules. The same is the case under Article 20.3 of the Joint Venture Agreement. Absent agreement to the contrary, the Tribunal is therefore to be appointed by the LCIA Court in accordance with Article 5.4 of the LCIA Rules.

22.     Notwithstanding the above, Claimants have proposed that this dispute be determined by three arbitrators, with each of Claimants, on the one hand, and Respondent DP World on the other, nominating one arbitrator for appointment by the LCIA Court, with the two arbitrators so nominated to agree on the third arbitrator to serve as chair of the Tribunal.

Absent such agreement, the third arbitrator would be appointed by the LCIA Court pursuant to the LCIA Rules.

23. By email dated 31 July 2014, Respondents agreed to this proposal.[6]

24. Claimants hereby nominate for confirmation as co-arbitrator:

Peter Leaver QC
One Essex Court
Temple
London EC4Y 9AR
Telephone: 020 7583 2000
Fax: 020 7520 4837
pleaver@oeclaw.co.uk

### 4. Place and language of the arbitration and applicable law

25. Pursuant to Articles 20.2.2-3 of the Concession Agreement, the place of arbitration is London, United Kingdom and the language of the proceedings is English. The same applies under Article 20.3 of the Joint Venture Agreement.

26. Article 22.6 of the Concession Agreement provides that it is to be *"governed by and construed in accordance with the laws of the United Kingdom."* The Joint Venture Agreement is governed by the laws of the Republic of Djibouti (*see* Article 27.1).

### 5. Pre-Arbitration Communications

27. By letter dated 11 April 2014, the Claimants, through their counsel Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), wrote to the Respondent DP World advising that the *"current contracts were obtained through your collusion with a corrupt government*

---

6 A copy of the 31 July 2014 email is annexed hereto as Claimants' Exhibit 22 ("C22").

8

*official, Mr Boreh*" and that "*accordingly, the current contracts cannot be allowed to stand*".[7]

28.   By letter dated 13 April 2014, DP World responded through its counsel, Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel"). DP World rejected the allegations made by the Claimants and issued disputes notices under Articles 20.1 of the Concession Agreement and Joint Venture Agreement. DP World requested that a meeting to resolve the dispute be held.[8]

29.   A "Disputes Meeting" was held in Djibouti on 27 April 2014. Thereafter, discussions continued on a without prejudice basis.

30.   By email dated 29 April 2014, Quinn Emanuel proposed that the dispute resolution process, and applicable time limits referenced in the agreements, be suspended until further notice to allow the discussions to proceed.[9] Gibson Dunn responded to some parts of the 29 April 2014 email by return email on the same day.[10] By email from Gibson Dunn to Quinn Emanuel sent on 2 June 2014, Claimants accepted DP World's proposal that the *status quo* be maintained while without prejudice talks remained ongoing.[11]

31.   By letter from Quinn Emanuel to Gibson Dunn dated 16 June 2014, DP World wrote to clarify which of the parties' respective rights it considered would be suspended during the without prejudice discussions. DP World sought Claimants' agreement that "*pursuant to Clause 20.2.6, both parties are obliged to continue to perform all of their*

---

[7]   A copy of the 11 April 2014 letter is annexed hereto as Claimants' Exhibit 4 ("C4").

[8]   A copy of the 13 April 2014 letter is annexed hereto as Claimants' Exhibit 5 ("C5").

[9]   A copy of the 29 April 2014 Quinn Emanuel email is annexed hereto as Claimants' Exhibit 6 ("C6").

[10]   A copy of the 29 April 2014 Gibson Dunn email is annexed hereto as Claimants' Exhibit 7 ("C7").

[11]   A copy of the 2 June 2014 email is annexed hereto as Claimants' Exhibit 8 ("C8").

9

*obligations under the Concession Agreement (and therefore maintain the status quo) whilst the discussions are ongoing until the dispute is either resolved amicably or submitted to arbitration and finally determined."*[12]

32.   The discussions have broken down and attempts to achieve a resolution have proved unsuccessful.

33.   By letter from Claimants to DP World dated 8 July 2014, Claimants exercised their rights to rescind the Concession Agreement, Joint Venture Agreement and Management Services Agreement.[13]   DP World was advised that:

> *"In order to maintain the operational status quo and mitigate disruption at the terminal, DPW shall be permitted to continue to manage DCT pending the determination of the arbitral tribunal on the matter. Djibouti is willing to make this accommodation on the conditions that DPW cooperate in having the arbitration heard as quickly as possible and in any event brought to a hearing within 6 months or less from the date of the constitution of the tribunal; that DPW fully cooperates with the Inspector General's staff (or any other observer appointed by the Inspector General) who may wish to observe the day ot day operations of the DCT during this interim period; and that DPW fully cooperates with an audit of DCT to be commenced by an independent firm at the request of the Inspector General. Kindly confirm that you agree to this proposal."*

## D.   BACKGROUND

### 1.   Factual background

34.   Djibouti is a sovereign State in the Horn of Africa.   It borders Eritrea to the North, Somalia to the South, and Ethiopia to the West.   It is strategically located at the crossroads of the world's busiest shipping lanes, linking Europe and the Suez Canal with the Horn of Africa, the Persian Gulf and the Far East.

---

12   A copy of the 16 June 2014 letter is annexed hereto as Claimants' Exhibit 9 ("C9").

13   A copy of the 8 July 2014 letter is annexed hereto as Claimants' Exhibit 10 ("C10").

10

35. Djibouti's ports are its most valuable State assets, located at the entrance to the Red Sea on the East-West trade route and providing a secure regional hub for transshipment and relay of goods. Djibouti's ports also offer vital proximity to East Africa and, in particular, to neighbouring Ethiopia. Ethiopia is a landlocked country with a population of more than 90 million. It is the largest economy in East Africa. Djibouti's ports, including the Doraleh Container Terminal, serve as the principal maritime outlet for imports to and exports from Ethiopia.

36. Prior to the construction of the Doraleh Container Terminal, Djibouti's main port was what is now referred to as the "old port of Djibouti". DP World was contracted to operate the old port in or around 2000, which represented the first marine terminal it managed outside the Gulf. The old port's prominence was superseded when the Doraleh Container Terminal came into operation in 2008; it is now Djibouti's busiest and most valuable port.

37. The Doraleh Container Terminal is a key strategic asset of the Republic of Djibouti. It is, by far, the most valuable marine terminal in Djibouti. Indeed it is the largest and most technologically advanced container terminal in the African continent. It has the capacity to handle 1.2 million TEU (twenty foot equivalent container units) per year. And unlike surrounding ports in the region such as Port Sudan and the Port of Berbera, its 18 metre draft and 1050 metre quay easily accommodate the largest ships currently in service.

2. The Concession Agreement and related contracts

*The Concession Agreement*

38. On 31 October 2006, the Republic of Djibouti and DP World (through DID) concluded the Concession Agreement for the construction, maintenance and operation of the Doraleh Container Terminal. Djibouti and DP World agreed to incorporate a joint venture company, DCT, to be the beneficiary under the Concession. The Concession Agreement was executed by or on behalf of the Republic of Djibouti and DCT. DP World (through DID) was named as a 'confirming party'. Upon execution of the 22 May 2007 Addendum to the Concession Agreement, DP World became the confirming party.

11

39. The Concession was for a period of 30 years and, in the absence of DCT giving notice to the contrary, the concession period would be *"automatically renewed for two additional periods of ten (10) years each"*.[14]

40. The Concession granted is broad and sweeping:

> *"Subject to the terms of this Agreement and in consideration, inter alia, of the payment of the Royalty by the Concessionaire, the Grantor hereby grants to the Concessionaire the sole and exclusive right and authority to develop the Project and to undertake the Operations and to let out sub-concessions in respect of the Project . . . and to do all things incidental or related thereto or which the Concessionaire considers desirable and appropriate to be carried on in connection therewith, during the Concession Period."*[15]

41. The rights granted to the Concessionaire include *"the exclusive right and authority to act as the governing body at the Site and . . . to set rules and regulations, including internal rules, regulations or procedures as necessary to undertake the Project and the Operations . . . ."*[16] The Concessionaire also is empowered to *"select[] the Contractors and agree[] the provisions of the Project Contracts, without the approval of the Grantor"*, albeit it agreed to engage only those persons *"possessing the requisite skill, expertise and capability . . . ."*[17]

42. Moreover:

> *"the Concessionaire shall be entitled to freely set, amend, levy, collect and appropriate Tariffs for and take the benefits and revenues of all Operations and activities performed at the Site and from all activities that are incidental or related thereto or which the Concessionaire*

---

[14] Concession Agreement, Art. 4.1.2.

[15] Concession Agreement, Art. 3.2.1.

[16] Concession Agreement, Art. 3.2.2.

[17] Concession Agreement, Art. 10.1.1-2.

12

*considers desirable and appropriate to be carried on in connection therewith.*"[18]

43. In consideration for the Concession, Djibouti receives an annual Royalty, being the higher of (i) US$ 6 million or (ii) 5% of the Gross Revenue earned by DCT from the levy of Tariffs.[19]  Unlike DP World's fees under the Management Services Agreement (*see* below), the $6 million base figure has no provision for escalation to account for inflation. On information and belief, this Royalty is well below industry standards, particularly given the Doraleh Container Terminal's status as a key strategic asset.

44. The Concession Agreement (and Joint Venture Agreement) contain exclusivity and non-compete clauses restricting Djibouti from establishing other ports or container terminals around the region.[20]  In comparison, there is nothing in the agreements to restrict Respondent DP World from doing so.  Consequently, DP World has since taken over the management of several competing ports, including those in Jeddah and Aden, which are also located on the Red Sea and compete for the Doraleh Container Terminal's transshipment cargo.

45. Pursuant to the Concession Agreement (as amended by an Addendum dated 22 May 2007), on 22 May 2007 the Republic of Djibouti and DP World became shareholders of nominal Respondent DCT.  PAID, Djibouti's statutory port authority, became the owner of two-thirds of the shares in DCT, and DP World became the owner of the remaining one-third.[21]

---

[18]  Concession Agreement, Art. 3.2.3 (emphasis added).

[19]  Concession Agreement, Art. 11.1.1.

[20]  Concession Agreement, Art. 3.6 and 7.1; Joint Venture Agreement, Art. 17.1-2.

[21]  A copy of the 22 May 2007 Addendum is annexed hereto as Claimants' Exhibit 11 ("C11"); *see also* Joint Venture Agreement (C2), Art. 4.3(b).

13

Ex. B - Page 14

46. The parties entered into a range of related agreements, each contemplated and/or mandated by the Concession Agreement, including, *inter alia*:[22]

    (a) the addendum to the Concession Agreement, dated 22 May 2007, by which DCT was inserted as the Concessionaire and DP World became confirming party;

    (b) the Joint Venture Agreement, dated 22 May 2007, which governed the relations between PAID and DP World as DCT's shareholders;

    (c) a port services agreement, dated 22 May 2007, which obliged Claimants and PAID to provide particular services to DCT in return for a tariff; and

    (d) the Management Services Agreement, dated 6 December 2007, under which DP World was appointed as Manager of the Doraleh Container Terminal (for the entire term of the Concession) in exchange for a management services fee.

    *The Joint Venture Agreement*

47. Whereas Clause I of the Concession Agreement confirms that (emphasis added):

    > "*Grantor [Claimants] has established the Concessionaire [DCT] as a joint venture limited liability company with PAID and an Affiliate of DPW as shareholders of the Concessionaire. The Grantor and DPW have, as of the date hereof, executed a Joint Venture Agreement in accordance with the terms of this [Concession] Agreement.*"

48. Whereas Clause (C) of the Joint Venture Agreement likewise confirms that "*[t]he main object of establishment of the Company [DCT] is the execution of the Concession Agreement and for undertaking the implementation and development of the Project*". Article 5.1 thus provides that the business of DCT "*shall be to undertake the reclamation of land for and development, operation and management of the Project, and to undertake*

---

[22] A list of the Doraleh Container Project transaction documents is annexed hereto as Claimants' Exhibit 12 ("C12").

14

*all other related or ancillary activities as are necessary for the fulfillment of its obligations under the Concession Agreement and the other Project Contracts . . . .*"

49.    While PAID has the majority ownership interest in the joint venture company DCT, DP World possesses complete control over the company's business. Among other things, "*the DPW Shareholders shall at all times have the right to nominate a majority of the Directors of the Board of Directors of the Company*" and "*the Board shall have ultimate responsibility for the management and control of the Company . . . .*"[23] In this regard, "*[t]he Board shall have the power to determine all Reserved Matters and any other matter that has not otherwise been determined or decided upon by the Manager or Managing Director . . . .*"[24]

50.    "Reserved Matters", set forth in Article 11.1 of the Joint Venture Agreement, represent all decisions that might potentially have a material effect on DCT's business. These include, among others, "*[t]he appointment of Contractors and governance of the Project Contracts with such Contractors for the development of the Project.*"[25] In addition to DP World nominating the majority of the directors empowered to make Board decisions, "*[a] resolution in relation to a Reserved Matter shall only be considered to be passed in a quorum is present and the DPW Director has voted in favour of such resolution.*"[26] Further, if a Reserved Matter is proposed by DP World, "*the Shareholders nominating the other Directors shall . . . cause such other Directors to vote in accordance with the proposal . . . .*"[27]

---

[23]   Joint Venture Agreement, Arts. 7.1(a), 8.5(a)

[24]   Joint Venture Agreement, Art. 8.5(b).

[25]   Joint Venture Agreement, Art. 11.1(ee).

[26]   Joint Venture Agreement, Art. 8.5(c)(i).

[27]   *Id.*

15

51.   As for the Manager and Managing Director, the Manager is DP World and *"the Manager shall be entitled to nominate the Managing Director"*, who *"shall be responsible for the day-to-day management of the affairs of the Company"*.[28]  With respect to matters to be determined by the Manager under the Management Services Agreement (*see* below), *"each of the Shareholders undertake to cause the Directors to exercise their votes in accordance with the recommendations of the Manager, unless it is proved that such recommendation has been made fraudulently or with gross or willful negligence by the Manager"*.[29]

52.   DP World also exercises complete control over DCT at the shareholder level.  Thus, pursuant to Article 9.1 of the Joint Venture Agreement, *"[e]xcept as may be required by Applicable Law . . . , the Shareholders agree that the Board of Directors or the Manager shall take all decisions of the Company"*.  And under Articles 9.3(a) and (b), where Applicable Law requires a shareholders' resolution, or with respect to Reserved Matters, decisions shall be:

"(a)     *. . . by way of a poll and will be considered to be carried only if the DPW Shareholders have voted in favour of such resolution. Where the DPW Shareholders place such a Reserved Matter for consideration of the Shareholders' Meeting, the Government Shareholders shall vote in accordance with the proposal of the DPW Shareholders.*

(b)     *Furthermore, if the DPW Shareholders are desirous of exercising their veto rights in relation to any resolution in a particular manner, the Government Shareholders shall exercise their voting rights in the same manner as the DPW Shareholders"*.

53.   Contrary to the standards DP World applied to itself in the negotiation of the Concession Agreement and related contracts (*see* discussion below), Article 5.3 of the Joint Venture Agreement requires that *"proceedings of the Company shall at all times be conducted in*

---

28   Joint Venture Agreement, Arts. 7.2(f), 7.15.

29   Joint Venture Agreement, Ars. 8.5(d).

16

*accordance with sound and best international business practice and the highest ethical standards, on sound commercial principles*".

*The Management Services Agreement*

54.   The Management Services Agreement was also entered into under the umbrella of and subject to the terms of Concession Agreement.   Whereas Clause F of the Concession Agreement confirms (emphasis added):

> "*The Grantor further acknowledges and confirms that the scope of DPW's authority under the [original old port] Management Contract shall be extended to the Doraleh Container Terminal, subject to the powers and authorities that shall be granted to DPW under the amended Management Contract.  The Grantor agrees and confirms that it shall cause the Management Contract to be amended in accordance with the terms of this [Concession] Agreement.*"

55.   Article 5.2(a) of the Joint Venture Agreement provides in similar terms that "*[i]n accordance with the requirements of the Concession Agreement, the Shareholders agree that they shall cause the Company [DCT] to enter into and fulfill its obligations under the Management Services Agreement . . . .*"

56.   Whereas Clause (D) of the Management Services Agreement notes the "wish" of DCT as Concessionaire under the Concession Agreement to "*appoint DPW as the Manager with exclusive and over-all control over and with day to day responsibility for the management and the operation of the Terminal . . . .*" Article 3.3 of the Management Services Agreement provides that, subject to certain narrow exceptions set out in Article 3.4:

> "*The Manager shall have the sole right and responsibility for managing its business and the operation of the Terminal and providing services to the Users in accordance with Good Industry Practice, and has the sole and exclusive right and obligation to perform the functions of a terminal operator for carrying out the operations of the Terminal and for collecting all revenues from the performance of such functions, including but not limited to the functions set out in Clause 7.3 of the Concession Agreement . . . .*"

17

57. In exchange for providing its management services, DP World is entitled to a Management Fee that *"shall be the higher of: (i) US$ 2,400,000 (the **Base Amount**); and (ii) 5% of the Gross Revenues"*.[30] The Base Amount is to be increased by 5% every five years with the 5% calculated on the basis of *"the Base Amount as previously increased"* (*i.e.*, on a compound basis).[31] It is highly unusual for management fees to be levied on gross revenue rather than on net profits, as this does nothing to incentivize the manager to increase profit margins. On information and belief, the percentage charged also is far higher than that charged in other comparable ports.

58. Again contrary to the standards DP World applied to itself in the negotiation of the Concession Agreement and related contracts, and falsely insofar as DP World is concerned, Article 42 of the Management Services Agreement provides that:

> *"The Manager and the Owner declare that neither Party nor its directors, employees or agents have paid nor have they undertaken to pay, and shall not after the Execution Date pay or undertake to pay, any unlawful commission, bribe, or any sums of money, whether in Djibouti or abroad, or in any other manner given or offered to give any gifts or presents in Djibouti or abroad, to any director, employee or agent of the other Party for the purpose of inducing such director, employee or agent to conclude this Agreement. Each of the Manager and the Owner hereby undertakes not to engage in any of said or similar acts during the Concession Period. The provisions of this Clause 42 shall not apply to routine hospitality in the normal course of business".*

3.  Negotiation of the Concession Agreement and DP World's Bribes

59. Negotiation of the Concession Agreement and related Project documents commenced around mid-2005. As noted above, the Concession Agreement was concluded at the end of October 2006. In May 2007, the Concession Agreement was amended, DCT was

---

30  Management Services Agreement, Art. 23(a) (emphasis in original); *see also* Joint Venture Agreement, Art. 5.2(c).

31  Management Services Agreement, Art. 24.

18

Ex. B - Page 19

incorporated and ancillary agreements were signed. DP World was appointed as Manager of the Doraleh Container Terminal in December 2007.

*Mr Boreh and his role*

60.    The Republic of Djibouti appointed Mr Boreh to negotiate the DCT Concession Agreement and related Project documents on its behalf.

61.    Mr Boreh was, from 2003 to 2008, the Chairman of the Djibouti Ports and Free Zones Authority (Claimant DPFZA). The DPFZA is a statutory authority originally established as the "Djibouti Ports Authority" by Presidential Decree 2002-0098/PRE dated 2 June 2002 and renamed "L'Autorité des Ports et des Zones Franches de Djibouti" by Décret 2003-0207/PRE of 9 October 2003. It has the power to regulate all activity within the Free Zone, including the power to permit or deny permission for activities conducted within its territory and to be informed of and monitor those activities.

62.    Mr Boreh was at all times the lead Government representative for the DCT negotiations, and often the sole representative. He signed all of the Project documents on behalf of the Republic of Djibouti. Notably, the Government was not represented by outside counsel in connection with the DCT negotiations and placed extraordinary reliance on Mr Boreh to represent and protect its interests. DP World (and DID) knew this.[32]

63.    Further, because he was the Chairman of the Board of Directors of the DPFZA, Mr Boreh was appointed as Chairman of the Board of DCT to represent the interests of the Republic of Djibouti and PAID. At the time of DCT's incorporation, Mr Boreh held one share in DCT on behalf of the Republic of Djibouti. He remained Chairman of the Board of DCT until he left Djibouti in 2008.[33]

*The "consultancy agreements"*

---

[32]  DP World, on the other hand, was represented by Economics Law Practice, an Indian firm, and Allen & Overy.

[33]  Boreh fled Djibouti in 2008 after tax evasion proceedings were brought against him and one of his companies. He has since been convicted of tax evasion and other criminal offenses.

19

64. Claimants have recently discovered that, while they were negotiating the Project documents, including the Concession Agreement, with DP World, DP World entered into two so-called "consultancy agreements" with a company owned by Boreh. The agreements do not relate to any real, underlying consultancy services. On the basis of the information available to Claimants, the only logical conclusion is that they were a front by which DP World paid bribes to Mr Boreh in exchange for his cooperation and assistance during the negotiations.

65. The first "consultancy agreement" was entered into on or around 30 April 2006 (it is incorrectly dated 31 April 2006), between DP World Djibouti Advisory FZE and S.Flame LLC, a Jebel Ali Free Zone company owned by Mr Boreh.[34] Under this agreement, DP World agreed to pay Mr Boreh's company S.Flame a lump sum of US$ 500,000 on 31 March 2007. The agreement is a brief, standard form consultancy contract with very little customisation. It was ostensibly for the provision of:

> "*Advisory and consulting services ... as shall reasonably be requested from time to time ... to assist the Company in managing its existing marine terminals, airport and other business handled by Company or other related DP World entities in Djibouti including potential future projects.*"

66. Under this "consultancy agreement", "consultancy fees" were to be paid irrespective of the services provided. The "consultancy agreement" did not require Mr Boreh's company to submit any invoices or other documents to substantiate the provision of actual services, or to otherwise report to the ostensible principal on the "services" provided.

67. On information and belief, neither Mr Boreh nor his company provided any such services to DP World. Even if services had been provided, by soliciting those services from Mr Boreh while he was a Government representative in negotiations to which the Republic of Djibouti was a counterparty, DP World placed Mr Boreh in a position of considerable

---

34 A copy of the '31 April 2006' Consultancy Agreement is annexed hereto as Claimants' Exhibit 13 ("C13").

20

conflict.    DP World deprived the Republic of Djibouti of Mr Boreh's disinterested advice.

68.    The timing of this "consultancy" arrangement also stands out:

(a)    It was signed at a time when DP World was facing pushback from Djibouti on certain terms of the Concession Agreement.    Among other things, Zeinab Ali, a legally-trained director of the DPFZA, had objected to numerous provisions of the Concession Agreement on the basis that they were "*one-sided*" and "*leonine*" and that they would "*strip the Djibouti government of its rights in the Board of Directors meetings and the Shareholders assemblies.*"[35]

(b)    On 29 April 2006, Zeinab Ali wrote to DP World and its lawyers.    She took issue with a number of proposed terms in the then current draft of the concession agreement, and set out a number of proposed amendments.[36]

(c)    The next day, 30 April 2006, Joost Kruijning of DP World forwarded Ms Ali's email to Economics Law Practice, DP World's lawyers, and to David Hawker of DP World.    Mr Kruijning noted that there were "*a few issues on our hands that would stop us from coming to a final conclusion*".    Mr Kruijning asked Mr Hawker:

> "*Is ARB in Djibouti this week? If so, when would he have time to meet with us to finalise some of the items that we can't reach agreement over?*"[37]

(d)    Claimants understand the reference to "ARB" to be a reference to Abdourahman Boreh.

---

[35]    Annexed hereto as Claimants' Exhibits 14 and 15 ("C14" and "C15") are copies of representative communications.

[36]    A copy of her 29 April 2006 email is annexed hereto as Claimants' Exhibit 16 ("C16").

[37]    A copy of this email chain is annexed hereto as Claimants' Exhibit 17 ("C17").

21

(e)     DP World must indeed have met with Mr Boreh, because DP World and Mr Boreh (through his company S.Flame) then covertly entered into the first "consultancy agreement" – entitling him to a lump sum payment of $500,000.

69.     The timing of the payment is also interesting. The $500,000 lump sum was to be paid almost one year later, on 31 March 2007 – after the date on which the Concession Agreement was to be signed. The $500,000 payment appears to have been a success fee, payable to Mr Boreh after he had ensured that Claimants concluded the Concession Agreement on terms acceptable to DP World.

70.     From that point onwards, Mr Boreh overruled Ms Ali (who had argued throughout that the agreements were one-sided), and did what he could to ensure the Concession and related agreements were signed.

71.     DP World entered into a second "consultancy agreement" with S.Flame on 13 June 2007, through DP World's sister company DP World FZE (another wholly-owned subsidiary of DP World Ltd).[38] The "consultancy fee" under this agreement was US $6,000 per month, payable throughout the term of the agreement from 13 June 2007 to 29 September 2008. The term of the "consultancy agreement" was later extended for another year, to 29 September 2009.[39]

72.     The "services" were to relate to:

> "the Security systems and security intelligence for optimisation of Operations at the Port of Djibouti, managed by the Company. During the period the COMPANY may assign the services of the Consultant to others, as the COMPANY may deem appropriate."

73.     Again, the timing of this agreement is notable. By that stage:

---

[38] A copy of the 13 June 2007 Agreement is annexed hereto as Claimants' Exhibit 18 ("C18").

[39] A copy of the agreement to extend the 13 June 2007 Agreement is annexed hereto as Claimants' Exhibit 19 ("C19").

22

(a)    Boreh (*i.e.*, S.Flame) had just been rewarded with the $500,000 success fee under the first "consultancy" agreement;

(b)    The parties had recently established their joint venture company DCT and were in the early stages of the DCT venture;

(c)    Mr Boreh had been elected to sit on DCT's Board as Chairman;

(d)    The parties had signed the Concession Agreement (31 October 2006), Joint Venture Agreement (22 May 2007) and the Addendum to the Concession Agreement (22 May 2007); and

(e)    The parties were in the process of negotiating the Management Services Agreement (which was signed on 20 December 2007).

74.    Like the first "consultancy agreement", under the second agreement "consultancy fees" were to be paid irrespective of the services provided. Mr Boreh's company was not required to submit any invoices or otherwise report to the principal to substantiate such "services".

75.    On information and belief, neither Mr Boreh nor his company S.Flame provided any of the services referred to in the 13 June 2007 agreement. The "consultancy fees" paid under this agreement appear to have been a retainer, ensuring Mr Boreh's continued assistance in furthering DP World's interests at the expense of the Republic of Djibouti.

76.    To recap, DP World agreed during a crucial stage of the Concession Agreement negotiations to pay Mr Boreh $500,000 upon completion of that Agreement and agreed immediately thereafter to pay him a monthly retainer. The payments were deliberately kept secret through the use of offshore companies and bank accounts. These payments were made from DP World accounts while Boreh was the Chairman of Djibouti's DPFZA, the Government representative in the DCT negotiations and the Chairman of DCT. Mr Boreh was also important to numerous of DP World's related parties' other endeavours (such as the development of the Haramous villas, discussed below). Moreover, the payments were made to S.Flame pursuant to undisclosed "consultancy"

23

agreements in connection with which it appears no consultancy services were provided. Stated differently, the payments were bribes.

### *Unexplained payments*

77. Claimants have identified many millions of dollars passing between DP World and its affiliates and companies owned and controlled by Boreh. Claimants are in the process of identifying whether any legitimate explanation exists for those payments. Claimants reserve their right to fully plead these issues upon completion of their investigation.

### *Award of valuable sub-contracts to Boreh's company*

78. As discussed above, under the Joint Venture Agreement and Management Services Agreement, DP World exercises complete control over DCT's business, including with respect to the award of Project contracts. DP World used this control to provide further benefits to Boreh by ensuring that DCT awarded Boreh's company Soprim Construction SARL with major construction contracts for all of its projects.

79. In particular, and among others, on 10 December 2006, DCT awarded Constructora Norberto Odebrecht S.A. ("Odebrecht") a contract that was eventually valued in excess of US$ 217 million for the engineering, construction and procurement of phase I of the Doraleh Container Terminal works. DCT's contract with Odebrecht specifically contemplated that Odebrecht would *"sub-contract the whole of the works to the joint venture between Odebrecht Djibouti FZCO ("ODB DJIBOUTI") and SOPRIM Construction SARL ("SOPRIM")"*, i.e. Boreh's company.[40] The joint venture agreement, approved by DCT, entitled Soprim to receive 40% of the net profits while carrying out only 8% of the works.

### *Financial benefits given to Mr Boreh by DP World Ltd's sister companies*

---

[40] A copy of the 10 December 2006 Letter of Acceptance is annexed hereto as Claimants' Exhibit 20 ("C20").

24

80. DP World Ltd, or its Chairman Sultan bin Sulayem, also arranged for Mr Boreh to receive substantial benefits through DP World Ltd's sister companies, Nakheel Hotels and Resorts LLC ("Nakheel") and Nakheel Hotels and Resorts SARL ("Nakheel SARL"). Mr Bin Sulayem was, at all relevant times, the Chairman of both companies.

81. Mr Bin Sulayem caused Nakheel SARL to purchase land for the development of luxury villas in Djibouti's Haramous area from Mr Boreh's company Djibouti Investment and Development SARL ("DIDS") at a substantial mark up, giving Boreh a windfall gain. Thus, on 13 July 2008, pursuant to a concession granted by the Republic of Djibouti, DIDS was granted a plot of land in Haramous for the price of DJF 101,185,000 (US$ 570,000). Just four months later, on 23 November 2008, DIDS sold this land to Nakheel SARL for US$ 4 million. Mr Boreh represented DIDS in this transaction and Nakheel SARL was represented by Mr Bin Sulayem. Their personal involvement, together with the timing and nature of the transaction, suggest it was not done at arms' length and instead was designed to further reward Boreh.

82. Mr Bin Sulayem also caused Nakheel SARL to award Mr Boreh's company Soprim a US$ 28,632,198 construction contract for the luxury villas. In this regard, Nakheel SARL entered into a construction contract with Homan Engineering Company Ltd on 5 March 2006. Mr Bin Sulayem made clear to Homan representatives that it was a condition of it being awarded the construction contract that Homan appoint Soprim as its joint venture partner. Homan did so in May 2006. This transaction again occurred during the negotiation of the Concession Agreement and at around the same time as his first "consultancy" agreement.

*Agreement to covertly transfer shares in DP World to Mr Boreh*

83. The Claimants' recent investigations into Mr Boreh's affairs have revealed an agreement dated 20 September 2007 by which DPI World Terminals FZE agreed to sell 15% of its shares in DP World to Value Additions Ltd, an offshore Samoan Islands company owned

25

by Boreh.[41]  The consideration under this agreement is only US$ 1.  Thus, Mr Boreh was to indirectly acquire 4.95% of DCT's issued share capital for $1.

84.  At no time did Mr Boreh or DP World disclose to the Claimants that an agreement was reached for Boreh to become a shareholder in DP World and, therefore, a significant indirect shareholder in DCT.  Whether consummated or not, the fact that in 2007 DP World engaged in secret discussions with Boreh to indirectly transfer shares in the Project company DCT to him does not pass the smell test.  The smell is one of bribery and corruption.

*Benefits conferred upon DP World*

85.  Claimants are not required to prove that DP World received any benefits before being entitled to rescind the Concession, Joint Venture and Management Services Agreements for bribery and corruption.  Nonetheless, it is clear that DP World received those agreements, and received them on highly favourable terms (as described above), as a product of Mr Boreh's doing its bidding while under a very obvious conflict of interest.

86.  Benefits were also conferred on DP World's Chairman, Mr Bin Sulayem.  Claimants' investigations have revealed that Boreh procured the purchase of prime, oceanfront real estate in Arta, Djibouti, for Mr Bin Sulayem personally.  Mr Boreh then arranged for his construction company Soprim, and Odebrecht, to build a multi-million dollar luxury villa known as "Cascade House" on that land.  Claimants have seen evidence that "Cascade House" was paid for, at least in part, from DCT accounts controlled by DP World.  Again, none of this passes the smell test.

87.  Claimants have access to only a limited pool of information and evidence concerning the relationship and "transactions" between DP World and Boreh.  Claimants reserve the

---

41  A copy of the 20 September 2007 Agreement is annexed hereto as Claimants' Exhibit 21 ("C21").  The copy in Claimant's possession is signed on behalf of Mr Boreh's company only.

26

right to supplement and/or revise their claims with respect to these matters as further information becomes available, whether through disclosure or otherwise.

## E.   CLAIMS

88.   As alleged herein, DP World paid bribes and gave other illicit benefits to Mr Boreh, the Claimants' representative in the negotiation of the Concession Agreement and related Project documents. The Concession Agreement and related Project documents are tainted with illegality. In the circumstances, they are voidable.

89.   Under English law:

> "It is well established that a principal who discovers that his agent in a transaction has obtained or arranged to obtain a bribe or secret commission from the other party to the transaction is entitled, in addition to other remedies which may be open to him, to elect to rescind the transaction ab initio or, if it is too late to rescind, to bring it to an end for the future".[42]

90.   Moreover:

> "The remedy is not confined to cases where the agent has taken a bribe or secret commission in the strictest sense. It is available whenever, without his principal's knowledge and consent, the agent has put himself in a position where his interest and duty may conflict. A principal is entitled to the disinterested advice of his agent free from the potentially corrupting influence of an interest of his own. Any such private interest, whether actual or contemplated, which is not known and consented to by his principal, disqualifies him
>
> * * *
>
> The principal, having been deprived by the other party to the transaction of the disinterested advice of his agent, is entitled to a further opportunity to consider whether it is in his interests to affirm it".[43]

---

[42]   *Logicrose Ltd. v Southend United Football Club Ltd.* [1988] 1 WLR 1256 (Millet, J.).

[43]   *Id.*

27

Ex. B - Page 28

91. "Bribes" are broadly defined under English law to include *"the payment of a secret commission, which only means (i) that the person making the payment makes it to the agent of the other person with whom he is dealing; (ii) that he makes it to that person knowing that that person is acting as the agent of the other person with whom he is dealing; and (iii) that he fails to disclose to the other person with whom he is dealing that he has made that payment to the person whom he knows to be the other person's agent. Those three are the only elements necessary to constitute the payment of a secret commission or bribe for civil purposes."*[44]

92. The Concession Agreement, Joint Venture Agreement and Management Services Agreement were procured by DP World through bribery and corruption. Claimants were deprived of Mr Boreh's disinterested advice, which deprivation is enhanced by the fact that they were not represented by outside counsel. In the circumstances, the Claimants are entitled to treat these agreements as voidable.

93. Claimants have exercised their right to rescind the Concession Agreement, Joint Venture Agreement and Management Services Agreement, while agreeing that the *status quo* may be maintained pending a determination that they were entitled to do so.

94. Where an agreement is rescinded for bribery and corruption, the victim is entitled to damages: (i) caused by the fraud, here the excess profits received by DP World as a result of obtaining more favourable contract terms as a result of the bribery and corruption; and (ii) required to put the parties in the position they would have been in absent the offending agreement, together with restitution of the amount of the bribes paid.

95. The information in Claimants' possession is currently insufficient to quantify their damages. This will be done during the course of the arbitral proceedings.

---

[44] Per *Slade J in Industries & General Mortgage Co Ltd v Lewis* [1949] 2 All ER 573; *see* also *Ross River Ltd v Cambridge City FC* [2008] 1 All ER 1004: *"Bribery is committed where one person makes, or agrees to make, a payment to the agent of another person with whom he is dealing without the knowledge and consent of the agent's principal"*.

28

## F.    RELIEF SOUGHT

96.    Claimants seek an Award:

(a)    declaring that each of the Concession Agreement and Joint Venture Agreement is voidable;

(b)    declaring that Claimants were legally entitled to rescind, and did legally rescind, each of the Concession Agreement and Joint Venture Agreement

(c)    for damages (i) caused by DP World's bribery and corruption, (ii) necessary to restore the *status quo ante* and (iii) in the amount of the illegal bribes and other benefits conferred on Mr Boreh;

(c)    directing the Respondent DP World to reimburse the Claimants for their arbitration costs, including legal fees and expenses; and

(d)    for such other relief as the Tribunal may consider warranted.

Date:   7 August 2014

For and on behalf of Claimants Republic of Djibouti, Djibouti Ports and Free Zone Authority and Port de Djibouti SA

*Gibson Dunn & Crutcher LLP*

Cyrus Benson
Penny Madden
Douglas Watson
Ceyda Knoebel
GIBSON, DUNN & CRUTCHER LLP
2-4 Temple Avenue
London EC4Y 0HB
UK
Tel:    +44 20 7071 4000
Fax:    +44 20 7071 4244
Email: cbenson@gibsondunn.com

29

Ex. B - Page 30